# United States District Court
## Western District of Wisconsin

DYLAN HANCOCK,

Plaintiff,

Case No. 24-cv-410

v.

BARRON COUNTY,
and Sheriff Chris Fitzgerald, Deputy Eric Sedani,
Deputy Christopher Welker, Deputy Heather Hughes,
Deputy Andrew Krahenbuhl, and Anthony Weigand,

Defendants.

# COMPLAINT

## I. NATURE OF ACTION

101. Dylan Hancock brings this civil action under the Americans with Disabilities Act and 42 U.S.C. § 1983 to obtain appropriate relief for the violation of rights secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, which occurred when a Barron County Sheriff's Department deputy shot Plaintiff Hancock through the window of his bedroom to effectuate his warrantless home arrest for alleged misdemeanors, rendering him quadriplegic.

## II. JURISDICTION AND VENUE

### A. Jurisdiction.

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B. Venue

202. The Western District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of the Western District of Wisconsin within the meaning of U.S.C. § 1391(b).

## III. PARTIES

### A. Plaintiffs

301. Dylan Hancock is an adult resident of the State of Wisconsin with the capacity to sue and be sued in this Court.

### B. Defendants

302. Defendants Eric Sedani, Christopher Welker, Heather Hughes, Andrew Krahenbuhl, Anthony Weigand, and Chris Fitzgerald, are natural persons with the capacity to sue and be sued in this Court.

303. Each of the individual Defendants was a law enforcement officer employed by the Defendant Barron County at all times material to this action.

304. At all times material to this action, each individual Defendant was acting within the scope of his or her employment within the meaning of § 895.46 Wis. Stats.

305. At all times material to this action, each individual Defendant was acting under color of state law.

306. The Defendant Barron County is a Wisconsin municipality with the capacity to sue and be sued in this Court. It was the employer of the individual Defendants when the conduct alleged herein was committed.

307. Sheriff Chris Fitzgerald is a policymaker for Barron County in regard to the law enforcement actions including but not limited to the decisions as whether to obtain warrants or act without them and the use of force by the deputies of the Barron County Sheriff's Department.

## IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. On July 14, 2021, at approximately 6:30 p.m., Barron County Sheriff Chris Fitzgerald, was on duty at the Barron County Fair, when he received a telephone call on his cell phone from Plaintiff Dylan Hancock's uncle, Tony Wolff.

402. Wolff reported to Sheriff Fitzgerald that his mentally ill nephew, Dylan Hancock, was having a mental health/manic episode, was intoxicated, and was sending threatening communications to the family indicating suicidal intent.

403. Wolff told Sheriff Fitzgerald that Dylan was upset because of a court hearing that day at which Dylan's then-pending charge of disorderly conduct had not been dismissed; Wolff said that Dylan was upset with Wolff for not helping Dylan get the charge dismissed and for having made the report that got Dylan charged with disorderly conduct in the first place.

404. Wolff told Sheriff Fitzgerald that Dylan's cousin, Brandon, had earlier reported that Dylan had posted a Snapchat picture of his Airsoft rifle pointed in the direction of Wolff's home, with the words, "Uncle Tony gonna be stinkin."

405. "Uncle Tony" Wolff told Sheriff Fitzgerald that Dylan, if he were going to be arrested, was a risk for suicide by cop.

406. Sheriff Fitzgerald had Barron County Dispatch open a Disorderly Conduct CAD log, and Deputies Eric Sedani (329), Chris Welker (323), and Heather Hughes (332) responded to the fairgrounds to be briefed by Fitzgerald.

407. Deputy Sedani was assigned to be primary officer, with Deputies Welker and Hughes to assist.

408. Deputies Anthony Weigand and Andrew Krahenbuhl were working the fairgrounds and were not assigned by Sheriff Fitzgerald to respond to the Hancock home.

409. Sheriff Fitzgerald told the responding deputies about the uncle's complaint and relayed to them the concern about Dylan committing suicide by cop.

410. However, Sheriff Fitzgerald, with policymaking authority, did not have his deputies tailor their law enforcement response to accommodate Dylan's known mental illness.

411. Approximately 30 minutes after the CAD log was opened, Deputy Sedani arrived at Wolff's house in Mikiana to take a statement. Deputies Welker and Hughes waited in the parking lot of the nearby General Store.

412. In an approximately 13-minute interview, Deputy Sedani received the following information from Wolff:

a. Dylan had a pending charge of disorderly conduct stemming from an earlier threat,[1] and Dylan had been to court that day on those charges and was very upset both before and after court, particularly at Wolff for making the report to police and then failing to help get that charge dismissed;

[1] Wolff had earlier reported Dylan to law enforcement for allegedly making threats to blow up the General Store following an alleged employment dispute where the General Store allegedly shorted Dylan's final paycheck. That charge would later be dismissed.

b. Dylan posted a picture of a gun pointing in the general direction of the uncle's home, and another picture with a gun pointed at his own head;

c. Dylan had mental health issues and needed mental health treatment, he was suicidal, and law enforcement needed to be "very careful" because Dylan might want to "do suicide by cop," and Wolff just wanted to make sure Dylan received some help;

d. Dylan had consumed eight alcoholic beverages already that day and might also be on drugs;

e. Dylan was lawfully in possession of firearms.

413. Deputy Sedani discussed with Wolff that it was debatable whether there was probable cause to arrest Dylan.

414. Deputy Sedani stated if there had just been a picture of a gun pointed in the general direction of Wolff's house, there would likely not be probable cause, but because the words, "Uncle Tony gonna be stinkin" were typed across he photo, that could be construed as a threat rising to the level of probable cause.

415. Deputy Sedani discussed that a factor negating probable cause was that Dylan did not send his messages directly to Wolff.

416. Deputy Sedani ultimately determined there was enough information to arrest Dylan for misdemeanor disorderly conduct.

417. Before parting, Wolff again warned Deputy Sedani that Dylan was mentally ill and intoxicated, and was currently suicidal or in a manic episode.

418. Deputy Sedani told Wolff that he was familiar with mentally ill people, and, typically, what he sees is a person like Dylan, is that while on medication, they would be doing well and "go quiet" for a long time, but because they then think they are doing well, they stop taking their medication, and then, because they have stopped taking their medication, they have a manic episode.

419. Deputy Sedani told Wolff that the plan would be to go to Dylan's house and try to get him to come outside where they would arrest him for disorderly conduct, and that if he refused to come outside, they would call the ERT.

420. By "ERT" Deputy Sedani meant the Barron/Rusk County Emergency Response Team. It is a special weapons and tactics unit and it is often referred to as the SWAT Team. The Emergency Response Team is made up of Barron County Sheriff's Deputies, Rusk County Sheriff's Deputies and members of the Rice Lake Police Department.

421. Deputy Sedani left Wolff's and called Dylan's cousin Brandon, who confirmed that he had seen the picture on Snapchat and told Deputy Sedani that he had had multiple communications with Dylan that day.

422. Deputy Sedani asked Brandon if Dylan was making threats in any of his communications, and Brandon told Deputy Sedani that Dylan "keeps saying he wants to kill himself."

423. Deputy Sedani went to the General Store to meet Deputies Hughes and Welker, and shared with them the plan to go to Dylan's house to effectuate the misdemeanor arrest, and the concern that Dylan might be suicidal and might try to commit suicide by cop upon arrest.

424. None of the Deputies attempted to secure a warrant.

425. None of the Deputies attempted to tailor their law enforcement response to accommodate Dylan's known mental impairment.

426. Deputies Sedani, Hughes, and Welker arrived at Dylan's home between 7:30 and 8:00 p.m., approximately one hour after the CAD log had been opened, to carry out their plan for a warrantless misdemeanor arrest.

427. The deputies spoke to Dylan through his bedroom window, asking Dylan to come outside, and Dylan refused.

428. Dylan, from his bedroom window, shouted out to the deputies that they were violating his constitutional rights and he asked them to leave.

429. Dylan yelled that it was his First Amendment right to post whatever he wanted on social media.

430. Dylan apologized for the fact that he was slurring his words, explaining that he had been drinking after court.

431. Dylan told the deputies that his father was at home with him.

432. Dylan asked the deputies to leave.

433. The deputies stated they would not leave until Dylan came outside to talk.

434. Dylan stated he had his own rights and would not be leaving his residence; Deputy Sedani updated dispatch that Dylan was refusing to come out of the residence and that they had Dylan at gunpoint.

435. Dylan picked up his long gun and backed away from his bedroom window saying, “I feel threated. You are threatening me by pointing a gun at me.”

436. About then, Deputies Andrew Krahenbuhl and Anthony Weigand, who were still at the fairgrounds about 12 miles away, heard this dispatch report that law enforcement had Dylan at gunpoint through a window screen, and they both left the fairgrounds and began responding in emergency mode in separate vehicles.

437. Dylan became agitated, saying, “And then you pulled a fucking gun on me? What would happen if I pointed a gun at you?”

438. Deputy Welker (who was outside, in the yard) ordered Dylan (who was inside, in his bedroom) to put the gun down and show his hands.

439. Dylan set the gun down and raised both of his hands without the rifle in them, obeying Deputy Welker’s order.

440. A deputy advised dispatch that Dylan had put the gun down, but was not willing to come outside and that he still had the gun with him in the bedroom.

441. Dispatch was further advised by a deputy that neither Dylan nor his father were willing to leave the residence, as Dylan's father was trying to calm and comfort his upset son.

442. Deputy Welker requested that the SWAT Emergency Response Team respond to the scene.

443. Deputy Welker then decided to make it look like the deputies were abiding by Dylan's wishes and leaving his property, so as to give Dylan time to emotionally decompress.

444. Deputy Welker holstered his firearm, got in his squad, and drove away. However, he only drove around the block. When he returned he grabbed his rifle, and then took cover in a tree line southwest of Dylan's home.

445. From Deputy Welker's new position, he could still see the bedroom window.

446. Deputy Hughes repositioned to the passenger side of Deputy Sedani's squad car in Dylan's driveway, while keeping her gun pointed at the bedroom window.

447. After deputies had been on scene for 12 minutes, at approximately 8 p.m., Deputy Sedani informed dispatch, "Dylan has made the threat to take his own life by police, still in the bedroom, dad is still trying to talk to him, 323 (Welker) backed away from the residence, myself (329/Sedani) and 332 (Hughes) are still there."

448. Also at about 8 p.m., an ambulance was staged at the General Store on standby.

449. At about 8:01 p.m., Dylan's father confirmed that Dylan has been drinking which was unusual behavior for Dylan, and Deputy Sedani reported to dispatch that Dylan has been drinking.

450. At about 8:02 p.m., Deputy Sedani reported that "Dylan has AR and it sounds like a hunting rifle in the bedroom with him as well."

451. At about 8:03 p.m., after the deputies had been at Dylan's home for 16 minutes, Deputies Andrew Krahenbuhl and Anthony Weigand arrived on scene.

452. Deputy Weigand (squad 312) pulled up right behind Hughes' squad car in front of Dylan's bedroom window (where Welker had been previously parked).

453. Hughes remained in the driveway at the passenger side of Sedani's squad (329) covering Dylan through the window with her firearm, and Krahenbuhl stood to the right of Hughes.

454. Squad 312 (Weigand) and 329 (Sedani) can be seen in the following diagram in front of Dylan's home:




455. The home and bedroom is depicted in the following diagram, with a "w" at the window through which Dylan and the deputies were conversing:




456. Deputy Weigand took a position behind his own squad (312).

457. With the arrival of additional deputies, Dylan grew upset because he had ordered law enforcement off his property, and it had looked like law enforcement was leaving, but then additional offers had showed up.

458. Dylan began a countdown stating that either the Deputies must leave his property or he would commit suicide.

459. At 8:06:32, Deputy Weigand reported to dispatch that Dylan was "advising we got 2 minutes to leave."

460. At 8:07:20, Deputy Weigand reported to dispatch that the deputies had one minute to leave.

461. At 8:08:06, Deputy Weigand reported to dispatch, "30 seconds, he's advising 30 seconds."

462. At approximately 8:08:26, Weigand asked, "Is dad in the residence?" and another deputy confirmed, "Yes, he is."

463. Approximately 8:09, Deputy Wolf (squad 316) arrived and parked behind Deputy Weigand, and stood behind a camper parked across the street from Dylan's home.

464. At 8:11:03, Deputy Weigand said, "He's got a gun pointed at us, he's got a gun!"

465. Dylan had not pointed a gun at the deputy.

466. Deputy Weigand, took cover behind his squad for a few seconds while he considered how to respond.

467. Weigand, who was approximately 40 yards from Dylan's window, decided to shoot Dylan through his bedroom window.

468. Weigand did not give Dylan any warning that he was about to be shot.

469. Weigand did not give his fellow deputies any warning that shots were about to be fired.

470. At 8:11:07, Weigand rose up from behind his squad, got his sights on Dylan through the bedroom window, and simultaneously yelled "drop the gun,"

once, as he fired his .223 semi-automatic rifle at Dylan twice, through the bedroom window.

471. Dylan had not even been near his window at the time of the shooting, but was near the opposite wall leaning against the bedroom door in an effort to keep his father from entering the bedroom.

472. No deputy other than Weigand fired, and no deputy knew that Weigand had fired.

473. Confusion erupted on the scene as the deputies (other than Weigand) wondered who had fired the shots they had heard.

474. Dylan's father came running out of the home saying Dylan was down.

475. About 90 seconds later, a deputy asked Weigand over dispatch, "312 who shot there? 312 we all good?"

476. Weigand did not respond, but the Sheriff (301) responded that law enforcement fired the shots.

477. Deputy Hughes advised dispatch that Dylan was down.

478. At this point, Dylan's father asked for the deputies to enter and help his son, but the deputies refused to enter because Dylan had access to firearms.

479. Dylan's father ran back in the home, and grabbed two guns – a .223 caliber rifle from Dylan's closet, and a 10mm from Dylan's bedroom floor, and brought them outside and told deputies Dylan was struggling to breathe.

480. The gun on Dylan's floor by his body had no rounds chambered.

481. At 8:13 p.m., Deputy Hughes reported to dispatch that Dylan's father came out with two guns and was requesting medical care for Dylan.

482. At 8:14 p.m., Deputies Krahenbuhl, Sedani, Wolf, and Hughes entered the home, finding Dylan on the floor near his bedroom doorway on the opposite wall from the window, which was above the bed:



483. Dylan had a through and through gunshot wound to the rear of his neck, resulting in a complete spinal cord injury in the lower cervical spine causing paralysis at the shoulder level and below. The entrance wound was on the left lateral neck, tracking to an exit would on the right posterior neck.

484. Deputy Hughes escorted Dylan's father out of the residence, allowing Dylan's father to believe that Dylan had shot himself and to report that to their family. Dylan's mom[2] texted Dylan's uncle to report that Dylan had just shot himself.

485. Dylan was never charged with anything related to this shooting, and he has never been convicted of any crime.

486. Barron County returned Dylan's two lawfully owned guns to him.

487. Dylan has since required a tracheostomy tube for breathing, a pacemaker for heart regulation, and a feeding tube, and he will require many other medical interventions and a lifetime of care as he was rendered quadriplegic from the Complete Spinal Cord Injury to his cervical spine.

## V. BASIS OF LIABILITY

### A. Unreasonable Seizure: Fourth Amendment.

501. Defendant Deputies Eric Sedani, Christopher Welker, Heather Hughes, and Andrew Krahenbuhl committed a violation of the Fourth Amendment's prohibition on unreasonable searches and seizures when they remained on Plaintiff Dylan Hancock's property to effectuate a misdemeanor warrantless arrest of Plaintiff at home after Mr. Hancock clearly instructed them to leave.

---

[2] Dylan's mother has since passed away, but she was alive at this time.

502. Deputy Anthony Weigand committed a violation of the Fourth Amendment's prohibition on unreasonable searches and seizures when he remained on Plaintiff Dylan Hancock's property to effectuate a misdemeanor arrest of Plaintiff after Plaintiff clearly instructed the officers to leave, and then, again, when he chose to effectuate the warrantless misdemeanor arrest of Plaintiff by shooting him through his bedroom window.

503. Defendant Sheriff Chris Fitzgerald personally participated in and approved the decision that his deputies would remain on the Hancock property to effectuate a warrantless misdemeanor home arrest of Dylan Hancock, in violation of the Plaintiff's Fourth Amendment rights.

### B. *Monell* and ADA Claims against Barron County

504. Barron County is liable for those unlawful decisions made by Defendant Sheriff Chris Fitzgerald because of his status as a policy-maker.

505. Barron County was deliberately indifferent to the rights of its residents to be free from unreasonable seizures when it failed to adopt any policy or implement any basic training regarding providing law enforcement services in the context of a mentally ill suspect.

506. Barron County discriminated against Plaintiff Hancock on the basis of his disability when it failed to implement a policy that would provide a tailored response

by its deputies to accommodate a known mental health disability of a suspect, in violation 42 USC § 12112(b)(5)(A) *et seq*.

### C. Statutory Indemnification Liability of Defendant

506. The Defendant Barron County is liable for the unlawful acts of the individual Defendants because they were acting within the scope of their employment pursuant to Sec. 895.46, Wis. Stats.

## VI. DAMAGES and EQUITY

### A. Compensatory Damages

601. By virtue of the unlawful actions alleged above, Dylan Hancock suffered physical pain, emotional anguish, financial losses, the loss of ability to live a normal life, and other damages for which he should be compensated in an amount deemed just by the Court.

### B. Punitive Damages

602. Because the acts of the individual Defendants herein alleged were carried out maliciously or with reckless disregard for the Plaintiff's fundamental rights, the Plaintiff also seeks an award of punitive damages against each of the individual Defendants to deter them and others similarly situated from committing similar wrongful acts in the future.

## VII. CONDITIONS PRECEDENT

701. All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. JURY DEMAND

801. Plaintiff hereby demands a trial by jury of all issues triable of right to a jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court grant judgment against the Defendants, awarding compensatory damages in an amount that will fairly compensate the Plaintiff for his injuries; punitive damages in amounts that will justly punish the individual Defendants for their actions; and costs, attorneys' fees and litigation expenses as well as any further relief this Court deems just and lawful.

Dated this Wednesday, June 19, 2024.

Respectfully submitted,

THE JEFF SCOTT OLSON LAW FIRM, S. C.
Jeff Scott Olson
State Bar Number 1016284
Andrea J. Farrell
State Bar Number 1064773
1025 Quinn Drive, Suite 500
Waunakee, Wisconsin 53597
Phone (608) 283-6001

Fax (608) 283-0945
Email JSOlson@scofflaw.com

/s/ Jeff Scott Olson

Jeff Scott Olson

ATTORNEYS FOR PLAINTIFFS