In the
# United States District Court
For the
Western District of Wisconsin

DYLAN HANCOCK,

Plaintiff, Case No. 24-CV-410

v.

BARRON COUNTY, SHERIFF CHRIS FITZGERALD, DEPUTY ERIC SEDANI, DEPUTY CHRISTOPHER WELKER, DEPUTY HEATHER HUGHES, DEPUTY ANDREW KRAHENBUHL and ANTHONY WEIGAND,

Defendants.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Deputies armed with guns and without a warrant went to Plaintiff's home to effect his warrantless arrest for misdemeanor disorderly conduct, based on a complaint from a family member that he had posted a threatening Snapchat photo. The deputies planned to call SWAT to extract Plaintiff if he would not consent to arrest. The deputies immediately entered and remained in Plaintiff's constitutionally protected curtilage, just outside his bedroom window. Within 10 seconds and in response to the deputies' first question, Plaintiff made clear he would not consent and repeatedly requested to terminate the encounter. This motion seeks a judicial determination that (a) deputies violated the Fourth Amendment when entering and remaining just outside Plaintiff's bedroom window in his constitutionally protected curtilage in the face of Plaintiff's non-consent, and (b) deputies' refusal, from just outside the bedroom window, to accept Plaintiff's request, from his bedroom, to terminate the encounter, constituted an unreasonable seizure of Plaintiff inside his home. Plaintiff does not move on the remaining issues – including the constitutionality of the ultimate use of deadly force which, in this case, rendered Plaintiff a quadriplegic at the young age of 25.

**Table of Contents**

I. Summary Judgment Standard .......... 1

II. Introduction .......... 1

III. Material Facts and Summary of Argument .......... 3

IV. The Fourth Amendment protects not just the home from an unreasonable governmental breach; it protects the right of the *person* to be secure in his home. .......... 10

V. To give full effect to the Fourth Amendment's protection of the individual in his home, officers are forbidden from warrantlessly occupying the home's curtilage – such as a side yard just outside a bedroom window. .......... 11

VI. While law enforcement may briefly occupy the front walk to see if a suspect would like to consent in a "knock and talk," the Defendant Deputies could not constitutionally occupy the curtilage just outside Dylan's window nor remain after being asked to leave. .......... 12

A. The area occupied by the deputies just outside Plaintiff's bedroom window is curtilage. .......... 13

B. The deputies' purpose was to conduct a misdemeanor warrantless home arrest of the Plaintiff, and there was no implicit or explicit license for these officers to do that .......... 14

VII. Dylan was seized when his non-consent was rejected: any invasion greater than a peaceful, consensual "knock and talk" requires a warrant (or a warrant exception), because a citizen has every right to refuse to give up his right to be free from government intrusion in his home .......... 17

VIII. Pointing guns at Dylan and directing his movements was unquestionably a seizure. .......... 18

IX. Defendants cannot establish an exigency that would exempt them from the warrant requirement for occupying the curtilage or seizing a man in his home. .......... 20

A. Plaintiff's increasingly vociferous refusal to consent to a warrantless at-home arrest and assertion of his constitutional rights are not exigent circumstances, even though he was lawfully in possession of guns that he did not point at himself or officers. ........ 23

B. Concern for Plaintiff's welfare coupled with his access to guns does not constitute exigence circumstances that would do away with the warrant requirement. ........ 25

X. Defendants are not entitled to qualified immunity. ........ 28

A. Qualified immunity standard. ........ 28

B. It was clearly established that occupying the curtilage for law enforcement purposes was unreasonable, especially the persistence in the face of non-consent. 30

C. A reasonable officer would have known that arresting Dylan inside his home without a warrant was egregiously unreasonable regardless of where the officer was standing, and it was only matter of time before the Seventh Circuit would clearly so hold. ........ 31

XI. Conclusion ........ 38

## I. Summary Judgment Standard

"Summary judgement is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, but only then." *Hawkins v. Mitchell*, 756 F.3d 983, 987 (7th Cir. 2014), citing Fed.R.Civ.P. 56(a). (cleaned up.) Rule 56 permits a party to move for partial summary judgment – identifying the part of each claim on which summary judgment is sought. A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). A "genuine dispute" exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The burden is upon the moving party to show that there is no issue of material fact in dispute, and all doubts as to the existence of an issue of material fact must be resolved against movant." *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1339 (7th Cir. 1985) (internal citations omitted.). However, video evidence can eviscerate a factual dispute if the video is so definitive that there could be no reasonable disagreement about what the video depicts. *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

## II. Introduction

One issue in this case is whether the deadly force – where an officer out in Plaintiff's yard shot Plaintiff inside his bedroom by discharging a firearm through Plaintiff's bedroom wall and window – was constitutionally reasonable. This deadly force rendered the plaintiff, a young man in his 20's, a quadriplegic. This issue

ultimately will require the Court to "consider all the relevant circumstances, including facts and events leading up to the climactic moment," *Barnes v. Felix*, 145 S. Ct. 1353 (May 15, 2025), and will likely require a jury trial due to competing facts and inferences.

However, there is an initial, more limited-scope violation of the Plaintiff's Fourth Amendment rights that should be easy to resolve as a matter of law, even taking the facts in the light most favorable to Defendants – the initial Fourth Amendment violation of Plaintiff Hancock's right to retreat to his home and be free from government intrusion absent a warrant. So as not to define this right too generally, Plaintiff carves up the right into two clearly established rights: the right to be free from law enforcement intrusion upon curtilage, and right to be free from a warrantless in-home arrest absent consent.

In "determining reasonableness, we 'carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999), *citing Plakas*, 19 F.3d a1143, 1150 (7th Cir. 1994). In determining the constitutional validity of a seizure, courts look to the information the officers had at the moment the decision was made. *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964).

Plaintiff respectfully requests a decision that, as a matter of law, it was constitutionally offensive for the officers to continue to go through with their planned warrantless at-home misdemeanor arrest of Plaintiff after he made clear he would not voluntarily consent to the same – by entering and remaining in his curtilage and by refusing to respect his right to terminate the encounter, which amounts to a warrantless

seizure inside the home. The body camera video clearly establishes the material facts on these two preliminary issues, such that the objective "analysis of Fourth Amendment 'reasonableness is a pure question of law.'" *Pfalzgraf v. Reisner*, No. 23-CV-877-JDP, 2025 WL 1095951, at *3 (W.D. Wis. Apr. 11, 2025), quoting *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020).

## III. Material Facts and Summary of Argument

Barron County Sheriff Chris Fitzgerald, while at the local fairgrounds, received a phone call from Plaintiff Dylan J. Hancock's uncle, Anthony J. Wolff, (aka "Uncle Tony") on July 14, 2021, at approximately 6:47 p.m. (PPFOF 2-3.) Wolff called the Sheriff to complain that his nephew, Plaintiff Dylan Hancock, had posted a threatening photo to Snapchat, apparently angry after his appearance in court that day for a disorderly conduct charge. (PPFOF 2-3, 6.)

The complaint was logged as a "disorderly conduct," matter, and Defendant Deputies Eric Sedani, Chris Welker, and Heather Hughes responded to the call. (PPFOF 4.) Initially, while Welker and Hughes waited nearby, Deputy Sedani went to Wolff's house to interview him. (PPFOF 5, 21.)

The interview was captured on body cam, but in essence, Wolff explained that Dylan had been in court earlier in the day for a disorderly conduct case that had been brought on the basis of an earlier threatening statement.[1] (PPFOF 6.) After court, Dylan

[1] Wolff explained that Dylan had obviously not followed through on his earlier threat, but "he's making comments like that." (PPFOF 7.)

started drinking, and a family member saw that Dylan had posted on Snapchat a photo of a gun in a park saying, "ya uncle tony gonna be stinkin." (PPFOF 8.) Wolff explained that Dylan had "some mental issues," and Deputy Sedani said he would, "talk to my coworkers to see what we should do at this; see if there was enough for the Disorderly Conduct. I think so because of him stating your name in this picture." (PPFOF 12.) Deputy Sedani pointed out that, on the other hand, Dylan had not contacted Wolff to make a direct threat to him. (PPFOF 13.) Ultimately, Deputy Sedani determined there was enough information to arrest Dylan for misdemeanor disorderly conduct. (PPFOF 14.)

Deputy Sedani informed Wolff that the plan would be to go to Dylan's house and make contact, and that if Dylan refused to come outside, law enforcement would call the ERT, but hopefully Dylan would come out and "maybe he's just a talker." (PPFOF 15.) By ERT, Deputy Sedani was referring to the Barron/Rusk County Emergency Response team, which is a special weapons and tactics unit also referred to as the SWAT team. (PPFOF 16.)

Wolff warned Deputy Sedani to be careful because of a suicide by cop possibility because of Dylan's mental health issues. (PPFOF 9.) Wolff informed Deputy Sedani that at the very least he wanted Dylan Hancock's guns removed from him, because Dylan had a "house full of guns." (PPFOF 10.) Deputy Sedani responded that a judge could order the guns be removed after a hearing, but Sedani did not have the power to simply go into Dylan's house and remove any guns without a judge ordering it.

(PPFOF 10.) Deputy Sedani knew that Dylan was lawfully in possession of firearms. (PPFOF 11.)

Before departing, Deputy Sedani told Wolff that Sedani was familiar with mentally ill people, and, typically, what he sees is a person like Dylan, is that while on medication, they would be doing well and "go quiet" for a long time, and then because they then think they are doing well, they stop taking their medication, inducing a manic episode. (PPFOF 17.) Wolff told Deputy Sedani that, "My first instinct is to just go over and kick his ass," but he was calling police instead. (PPFOF 18.)

As he was leaving, Deputy Sedani offered to come back to Wolff's later: "if you'd like I could swing back here and the other two [deputies] can take him to jail." (PPFOF 19.)

After leaving Wolff's, Deputy Sedani informed Deputies Hughes and Welker, who had been waiting nearby, that they had enough information to arrest Dylan. (PPFOF 21.) The Defendants dispute among themselves whether Deputy Sedani also informed Deputies Hughes and Welker that Dylan might be at risk for suicide by cop behavior. (PPFOF 22.)

Deputies Sedani, Hughes, and Welker – armed with guns and without a warrant - arrived at Dylan's residence to "make contact with Dylan and arrest him for disorderly conduct and misdemeanor bail jumping," shortly before 8 p.m. – over an hour after Wolff had called to file the complaint against his nephew. (PPFOF 2, 23.) Again, the interaction was caught on video. The three deputies interacted with Dylan through his bedroom window – with Dylan inside, the deputies outside, and a screen

window between them. (PPFOF 24, 34.) Dylan was not willing to voluntarily exit his home without a warrant for his arrest. (PPFOF 25.) Instead, Dylan, from his bedroom window, shouted out to the deputies that they were violating his constitutional rights and he asked them to leave. (PPFOF 28.)

Within 10 seconds of the deputies arriving on the scene, the officers had asked Dylan if he wanted to come outside and talk, and he had answered "nope." (PPFOF 26.) A deputy asked why, and Dylan stated because the officers had already violated his constitutional rights. (PPFOF 27.) Around 40 seconds into the contact, with one deputy standing just outside Dylan's bedroom window, the deputies repeated their request for Dylan to come outside, which he again refused. (PPFOF 29.) As argued in greater detail below, there is no doubt that under the constitution, the interaction should have ended here. *Collins v. Virginia*, 584 U.S. 586, 592, 138 S. Ct. 1663, 1667, 201 L. Ed. 2d 9 (2018) (law enforcement cannot enter curtilage without a warrant or consent); *Fla. v. Jardines*, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (officers not invited to remain on the premises, or who are on the premises for an unlicensed purpose, must leave). The facts show that objectively, the deputies came for a purpose, to conduct a warrantless misdemeanor arrest under the dubious practice of requesting someone come out of their home for arrest, but they were, in no uncertain terms, denied consent by the occupant who made a valid choice to stand on his Constitutional rights and terminate the encounter.

Dylan, though unwavering in his verbal assertion of constitutional rights, was polite enough. The deputies asked Dylan about the violation of his constitutional

rights, and Dylan began explaining the First Amendment, and then apologized for drinking after court. (PPFOF 30.) The deputies replied there was no prohibition on Dylan drinking after court. (PPFOF 30.)

Dylan then retuned the focus to terminating the encounter, stating he felt threatened by officers "pulling up like this." (PPFOF 31.) In response, the Deputies said, "well, we are law enforcement." (PPFOF 31.) Dylan responded that he agreed and understood, and that was the reason he was speaking to them. (PPFOF 31.)

Dylan was seized, for Fourth Amendment purposes, no later than this point. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted). *See also*, *Torres v. Madrid*, 592 U.S. 306, 322, 141 S. Ct. 989, 1001, 209 L. Ed. 2d 190 (2021)("a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement"); *United States v. Jerez*, 108 F.3d 684, 689 (7th Cir. 1997)("seizure occurred if 'respondent could reasonably have believed that he was not free to disregard the police presence and go about his business.'"(*quoting Michigan v. Chesternut*, 486 U.S. 567, 576, 108 S. Ct. 1975, 1981, 100 L. Ed. 2d 565 (1988).

Ignoring the facts that Dylan was not consenting, and that the only reason he was speaking with them at all was because they were law enforcement and they were making him feel threatened, the deputies continued questioning Dylan about the

Snapchat photo and where he had been after court. (PPFOF 32.) They asked Dylan if he was allowed to carry guns, and Dylan explained that there was nothing prohibiting him from exercising his Second Amendment rights as nothing happened in court that day that would restrict his gun rights. (PPFOF 33.) As argued below – at this point, the officers had no consent, no warrant, and no arguable exigent circumstances, yet they remained trespassing on constitutionally protected curtilage and continued doggedly pursuing their plan to arrest Dylan.

After a few more minutes of questioning, a deputy expressed concern for his safety because "there is only a window between you and I." (PPFOF 34.) Implicitly noting that the only reason there was nothing but a window between them was because law enforcement was unreasonably occupying his curtilage, Dylan again said, "I would ask you guys to leave and stop harassing me," to which they responded, "**I'm not going to leave until we get done talking to you.**" (PPFOF 35, 36.) The above facts show that Dylan was seized inside his bedroom through law enforcements snubbing his right to terminate the encounter, in violation of *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684 (7th Cir. 2001); *Caniglia v., Strom*, 593 U.S. 194, 198, 141 S. Ct. 1596, 1600, 209 L. Ed. 2d 604 (2021); *Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (absent a warrant to be on the premises, an officer must "do no more than any private citizen might" lawfully and reasonably do); *U.S. v. Jerez*, 108 F.3d 684, 691-692 (7th Cir. 1997) (any law enforcement persistence in the face of refusal constitutes a Fourth Amendment seizure in the sense that it is a sufficient show of authority that "reasonable

person would [not] feel free to decline the officers' request or otherwise terminate the encounter." *Id.*, 108 F.3d 684 at 689).

A constitutional violation had been completed at that point, however, to avoid a cliff-hanger, here is how this incident played out. One of the deputies continued asking questions for a few seconds and then said, "Is there a reason you won't come out and talk to us," to which Dylan responded, "Yes. Because my rights have already been violated." (PPFOF 37.) The deputies asked Dylan if his dad would likely come out and talk, and Dylan speculated that his father probably would talk to them, but his father would not bring Dylan outside against his will because Dylan had his own rights. (PPFOF 38.)

As the deputies began to head toward the front door, Deputy Welker (from outside in the yard) saw a gun in Dylan's hand (while Dylan was still in his bedroom). (PPFOF 39.) Deputy Welker pointed his firearm at Dylan, and Welker (from outside in the yard) ordered Dylan (inside his bedroom) to put down the gun and show his hands, and come back near his window. (PPFOF 40, 42.) Dylan became upset, yelled that the officers were violating his rights and expressed extreme displeasure in having guns pointed at him – but he did respond to the orders by putting down his gun and raising both his hands. (PPFOF 41, 43.) For his part, Dylan did not point his gun at these deputies, even when they pointed guns at him. (PPFOF 44.)

Dylan, with the deputies' guns still trained on him, stated repeatedly, "You pointed a gun at me, what would happen if I pointed a gun at you?" (PPFOF 45.) Dylan told the police they were threatening his freedom. (PPFOF 46-47.) Deputy

Sedani updated dispatch – stating that Dylan was refusing to come out of the residence and that they had Dylan at gunpoint. (PPFOF 47.)

Just as the deputies had planned to do if Dylan would not consent to arrest, Deputy Welker requested that the SWAT/ERT respond to the scene. (PPFOF 15-16, 48.)

Dylan again told the officers they were on his property threatening him and asked why they were there, to which they responded they wanted to talk, to which Dylan responded *again* that he did not want to talk and he had already told the officers he was drunk right then. (PPFOF 49.)

Some deputies then pretended to leave, only to return to the property, and others repositioned, surrounding the house at gunpoint, waiting for ERT/SWAT to arrive. (PPFOF 50-54.) A few minutes later, two additional deputies arrived to the scene – and one of those deputies, Deputy Weigand, chose to respond to Dylan with deadly force by firing into Dylan's home. (PPFOF 55-56.)

## IV. The Fourth Amendment protects not just the home from an unreasonable governmental breach; it protects the right of the *person* to be secure in his home.

The Fourth Amendment commands that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Hawkins v. Mitchell*, 756 F.3d 983, 991 (7th Cir. 2014). "At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id., citing Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); *see also Payton v. New York*, 445 U.S. 573, 590, 100

S.Ct. 1371, 63 L.Ed.2d 639 (1980) (warrantless at-home arrests are presumptively unreasonable); *Caniglia v. Strom*, 593 U.S. 194, 198, 141 S. Ct. 1596, 1600, 209 L. Ed. 2d 604 (2021) (reaffirming the "very core" of the Fourth Amendment's guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.") There is a "special protection afforded the individual in his home by the Fourth Amendment." *Welsh v. Wisconsin*, 466 U.S. 740, 754, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984).

**V. To give full effect to the Fourth Amendment's protection of the individual in his home, officers are forbidden from warrantlessly occupying the home's curtilage – such as a side yard just outside a bedroom window.**

The Fourth Amendment protects more than traditional fixed, enclosed structures: the "Fourth Amendment's protection of curtilage has long been black letter law," in order to "five full practical effect" to the right to privacy in one's home. *Collins v. Virginia*, 584 U.S. 586, 592, 138 S. Ct. 1663, 1667, 201 L. Ed. 2d 9 (2018). The Fourth Amendment protects not just the right of people to be secure in their houses, but also from a physical intrusion of a constitutionally protected area – the areas immediately surrounding and associated with the home are part of the home itself for Fourth Amendment purposes. *Fla. v. Jardines*, 569 U.S. 1, 5, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013).

The Supreme Court has pointed out the obvious: the Fourth Amendment "would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Fla. v. Jardines*, 569 U.S. at 5; *see also Collins*

*v. Virginia*, 584 U.S. 586, 593 (Court explaining that constitutionally protected curtilage obviously incudes "the front porch, side garden, or area outside the front window." (internal quotation marks and citation omitted.) If it is "an area adjacent to the home and to which the activity of home life extends," it "is properly considered curtilage." *Collins v. Virginia*, 584 U.S. at 594. An area may be *observable* from a lawful vantage point, but nonetheless be curtilage that may not be *entered* without a warrant – so long as it is curtilage, it is "no less entitled to protection from trespass and a warrantless search than a fully enclosed garage." *Id*. at 600. Any physical intrusion of the curtilage without a warrant or consent is presumptively unreasonable. *Id*. at 586-87.

## VI. While law enforcement may briefly occupy the front walk to see if a suspect would like to consent in a "knock and talk," the Defendant Deputies could not constitutionally occupy the curtilage just outside Dylan's window nor remain after being asked to leave.

Simply going to Dylan's house with the hope that he would consent to an arrest was not in and of itself unlawful. In some circumstances it can be quite reasonable to simply see if a suspect will provide consent – in a peaceful tactic called a "knock and talk." *Kentucky v. King*, 563 U.S. 452, 466-67, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011). Just as any private citizen may do, in line with societal customs, police may approach a front door and seek voluntary cooperation from a suspect. *Fla. v. Jardines*, 569 U.S. 1, 8. However, absent a warrant, law enforcement may "do no more than any private citizen might do," *Kentucky v. King*, 563 U.S. at 469, and typically this means "approach the

home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Fla. v. Jardines*, 569 U.S. 1, 8.

Here, the deputies did not approach the home by front path, but stood directly outside Dylan's bedroom window. (PPFOF 24, 34.) The deputies' decision to occupy the curtilage is a distinct Fourth Amendment violation, because a person has a "distinct privacy interest in one's home or curtilage." *Collins v. Virginia*, 584 U.S. 586, 596.

### A. The area occupied by the deputies just outside Plaintiff's bedroom window is curtilage.

Here, the officers did more than the implicit license afforded to the world at large allows, and persisted in the face of refusal – which constituted both a Fourth Amendment seizure and a search. Any law enforcement persistence in the face of refusal constitutes a Fourth Amendment seizure. *U.S. v. Jerez*, 108 F.3d 684, 691-692. It is just as "undoubtedly" a "'search" when the government seeks to obtain information by intruding on curtilage. *Fla. v. Jardines*, 569 U.S. 1, 5.

Once it is determined that the deputies primarily carried out their activities on the curtilage, it must be determined if it was a licensed or unlicensed physical intrusion. *Fla. v. Jardines*, 569 U.S. 1, 6. The *implicit* license that all "girl scouts and trick-or-treaters" have does not apply to the side yard, just outside the bedroom window. *See id.*, at 8; *see also Collins v. Virginia*, 584 U.S. 586, 592 (the portion of a driveway that a visitor would traverse to reach the front door was not curtilage, but the remainder of a driveway that a visitor would *not* routinely travel to reach the front door was constitutionally protected curtilage.) A main reason curtilage is protected is to *prevent*

law enforcement from entering a man's property to observe him through his window. *Fla. v. Jardines*, 569 U.S. 1, 6; *see also United States v. McGrath*, 700 F. Supp. 3d 233, 244 (M.D. Pa. 2023) ("Ordinary visitors" do not "stand[] at side windows, peering inside with flashlights."); *see also State v. Wilson*, 2022 WI 77, ¶ 31, 404 Wis. 2d 623, 636, 982 N.W.2d 67, 74 ("Stated simply, private citizens would not feel they had an implicit license to enter the backyard—and neither would a Girl Scout in the words of the *Jardines* Court.")

### B. The deputies' purpose was to conduct a misdemeanor warrantless home arrest of the Plaintiff, and there was no implicit or explicit license for these officers to do that.

The Court determines the officer's purpose based on what it objectively appears law enforcement was there to do. *Fla. v. Jardines*, 569 U.S. at 10. (While officer intent is irrelevant, whether the officer had license to continue his "purpose" is based on what his actions objectively reveal a purpose to do.) The deputies here – objectively - entered this area to conduct a search and seizure as those terms are used under the Fourth Amendment. The deputies told the complainant outright that they would go to Plaintiff's house to attempt to get him to come outside for a warrantless misdemeanor arrest, and that if Plaintiff would not voluntarily exit, they would extract him with a SWAT team. (PPFOF 12-16, 19.) The deputies can recall discussing the plan for a misdemeanor arrest, but have no cohesive recollection if they discussed the suicide possibility. (PPFOF 21-22.) The deputies did not urgently respond to Plaintiff's home; they took more than an hour to get there, indicating the lack of any emergency. (PPFOF

2, 23.) And, after getting there, the deputies continued doggedly in the plan to extract and seize Dylan from his home, calling ERT/SWAT when he did not voluntarily exit, as they had earlier planned. (PPFOF 15-16, 19, 48.)

After determining that seizure of Dylan is what the deputies' "behavior objectively reveals a purpose" to do, the Court decides whether an objectively reasonable officer would think they had license to do that. *Fla. v. Jardines*, 569 U.S. 1, 10. The *implicit* license to knock and talk, granted to girl scouts, trick-or-treaters, and door-to-door salespersons, does not include a license to arrest the person inside the home. *See Fla. v. Jardines*, 569 U.S. 1, 9. (There may be an implicit invitation to knock and seek voluntary talk, but there "is no customary invitation" to bring a trained police dog "in hopes of discovering incriminating evidence.") The Court has suggested a simple "smell" test – if a routine visitor such as a salesman were conducting himself as the officers (here just outside and peering into a bedroom window, directing the movements of the occupant inside, and refusing to leave when prompted) – would that "inspire most of us to – well, call the police?" *Id*. at 9. If so, it is not part of the *implicit* license. Without an implicit license, officers need to show an explicit license – and since they had no warrant, they would need consent.

While Dylan did notice the deputies approaching and acknowledged them through his bedroom window (PPFOF 24-26, 34), this alone could not be reasonably construed as consent to their continuing presence on his curtilage. *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 691 (7th Cir. 2001) (a person who, from in his home, behind a screen, recognizes law enforcement standing outside, is "no evidence of consent.")

But, even if Dylan acknowledging the officers through his screen was a reasonable invitation to occupy the curtilage momentarily, Dylan's clear non-consent and repeated requests to terminate the encounter with the deputies required them to leave. Within the first 10 seconds of their arrival, Dylan informed deputies he would not come outside and talk to them. (PPFOF 26-28.) Thirty seconds later, the deputies repeated their request for Dylan to come outside, which he again refused. (PPFOF 29.) Since the deputies were not invited to linger longer, they had a constitutional duty to leave. *Fla. v. Jardines*, 569 U.S. at 8.

The deputies would not take no for an answer,[2] and Dylan told them he felt threatened by them "pulling up like this." (PPFOF 31.) In response, the deputies suggested they had a license that they did not have: "Well, we are law enforcement." (PPFOF 31.) Dylan responded he agreed and understood they were, and that was the reason he was speaking to them. (PPFOF 31.) Dylan made clear that he was submitting to their authority, to the extent of talking to them, despite his desire to terminate the encounter.

Dylan said, in no uncertain terms: "**<u>I would ask you guys to leave</u>** and stop harassing me," to which they responded, "**<u>I'm not going to leave</u> until we get done**

[2] See, e.g., *United States v. Jerez*, 108 F.3d 684, 692 (7th Cir. 1997)("Simply stated, this is a case in which the law enforcement officers refused to take "no" for an answer. Their actions, when objectively assessed, conveyed a message that compliance with their requests was required." (cleaned up)

**talking to you.**" (PPFOF 35, 36.) But the deputies had no *license* to do this, and Dylan had every right to refuse to consent. *Kentucky v. King*, 563 U.S. at 469 (law enforcement may rely on consent when it is "freely given"); *U.S. v. Jerez*, 108 F.3d 684, 691-692 (7th Cir. 1997) (any law enforcement persistence in the face of refusal requires warrant or exigent circumstances); *State v. Cundy*, 2023 WI App 41, ¶27, 409 Wis. 2d 34, 995 N.W.2d 266 (officers' refusal of person's request to terminate an at-home encounter is unreasonable absent warrant or exigent circumstances.)

## VII. Dylan was seized when his non-consent was rejected: any invasion greater than a peaceful, consensual "knock and talk" requires a warrant (or a warrant exception), because a citizen has every right to refuse to give up his right to be free from government intrusion in his home.

While officers may request voluntary cooperation from a suspect in his home, the suspect in the home may refuse to let the officers on his premises and may refuse to answer further questions at any time. *Kentucky v. King*, 563 U.S. at 469. Officers cannot "conduct a 'knock and talk' and then seize the person without a warrant when the individual comes to the door and the officer refuses the person's request to terminate the encounter, in the absence of a warrant exception such as exigent circumstances. If that were the case, it would upend four decades of Fourth Amendment jurisprudence as it relates to the home and curtilage." *State v. Cundy*, 2023 WI App 41, ¶27, 409 Wis. 2d 34, 995 N.W.2d 266 (internal quotation marks and citation omitted.)

As the target of the investigation, Dylan's consent is what matters – any refusal to submit to an at-home arrest was dispositive as to him, regardless of the fact that his

uncle or anyone else wanted him arrested. *See Georgia v. Randolph*, 547 U.S. 103, 122-23, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006) ("a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.")

Once Dylan clearly indicated his desire to terminate the encounter, the deputies' persistence violated the Fourth Amendment. For example, in *U.S. v. Jerez*, 108 F.3d 684, 691-692 (7th Cir. 1997), the Seventh Circuit explained while police, like a salesman, may peaceably walk up to the front door and knock on any home to attempt to engage in a consensual interaction – any "persistence, in the face of the refusal," transforms the interaction into a Fourth Amendment seizure. In *Jerez*, "The three minutes of silence by Room 161's occupants, when combined with the other circumstances of this case, especially the lateness of the hour, amounted to a refusal by Mr. Jerez and Mr. Solis to answer the door," and therefore the officers' persistence in the face of this refusal was a seizure. *Id.* at 691-92. As noted above, this case is even clearer as the deputies did not need to assume refusal, given the time of day or several minutes of no answer. Here, Dylan repeatedly let the deputies know he would not consent, he was not relinquishing his constitutional rights, and he wanted to terminate the encounter. (PPFOF 26-29, 31, 35-36.)

## VIII. Pointing guns at Dylan and directing his movements was unquestionably a seizure.

While trespassing in Dylan's curtilage – just outside his bedroom window – the officers seized Dylan by holding him at gunpoint. This was more than the *Jerez* seizure –

seizure by refusal to accept nonconsent. If shining a flashlight in a bedroom window to "illuminate[] Mr. Jerez as he lay in bed" "renders totally without foundation any characterization that the prolonged [3 minute] confrontation was a consensual encounter rather than an investigative stop," then certainly refusing to adhere to Dylan's clear and repeated statements of nonconsent over a ten minute period, culminating in holding Dylan at gunpoint, was unquestionably a seizure. *U.S. v. Jerez*, at 692.

After Dylan's multiple clear statements of refusal to come outside and nonconsent to their remaining on his property, a deputy, standing in curtilage, saw inside Dylan's bedroom that he had a gun. (PPFOF 39-42.) Dylan did not point it at anyone, and the deputies were aware that Dylan's guns were lawfully owned. (PPFOF 10, 11, 33, 44.) Dylan's movements were controlled at gunpoint by the deputies, and at their order, he put down his gun and raised both his hands. (PPFOF 41-43.) The Supreme Court has identified a number of factors that might suggest that a seizure has occurred, even where the person who may have been seized did not attempt to leave, including:

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (citations omitted).

*Kernats v. O'Sullivan*, 35 F.3d 1171, 1177–78 (7th Cir. 1994); *see also Doornbos v. City of Chicago*, 868 F.3d 572, 581 (7th Cir. 2017) ("A seizure can occur without any physical contact, such as when an officer makes certain displays of force like pointing a weapon

or using language or a tone of voice that indicates compliance is mandatory."); *see also Pfalzgraf v. Reisner*, No. 23-CV-877-JDP, 2025 WL 1095951, at *9 (W.D. Wis. Apr. 11, 2025) (officer's oral "instructions that Pfalzgraf remove his hands from his pockets and open them face up was a search.")

### IX. Defendants cannot establish an exigency that would exempt them from the warrant requirement for occupying the curtilage or seizing a man in his home.

The warrantless invasion of Dylan's home by occupying its curtilage, and the warrantless seizure of Dylan in his bedroom were unconstitutional, unless justified by exigent circumstances, such as the need to render *emergency* assistance to an injured occupant or to protect an occupant from imminent injury.[3] *Caniglia v. Strom*, 593 U.S. 194, 198; *Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011). A person can be seized in his home without a warrant where "the needs of law enforcement are so compelling that warrantless search [or seizure] is objectively reasonable." *Hawkins v. Mitchell*, 756 F.3d at 992, *quoting Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) and *Mincey v. Arizona,* 437 U.S. 385, 390, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

[3] Unrelated to this case, there are also exceptions for hot pursuit of a fleeing suspect and the need to prevent imminent destruction of evidence, most commonly in drug investigations where the evidence is "flushable." *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011).

Defendants bear the burden of proving exigent circumstances existed – that is, "**a compelling need for official action and no time to secure a warrant**,"[4] if they claim an exception to the warrant requirement. *United States v. Escobedo*, 397 F. App'x 205, 207–08 (7th Cir. 2010), *citing Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *see also Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984).

There is an important caveat here: law enforcement cannot rely on exigent circumstances for criminal interdiction activities as "exigent circumstances do not exist when the underlying offense is minor, typically a misdemeanor." *Hawkins v. Mitchell*, 756 F.3d at 992, citing *Reardon v. Wroan,* 811 F.2d 1025, 1028 (7th Cir.1987) (per curiam); *see also Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) ("When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make arrests only with a warrant issued upon probable cause by a neutral and detached magistrate."). While officers were free to attempt to get voluntary cooperation from Plaintiff – to see if he would consent to coming outside for a conversation or arrest – it is clear that this does not qualify as an emergency. *Hawkins v. Mitchell*, 756 F.3d at 992 ("Exigency case law makes clear that [the purpose of questioning a suspect about a situation], which amounts to ordinary investigation of possible crime, does not qualify.)

[4] The test used by Wisconsin courts is "whether there are objective facts known to the officer that would reasonably lead him to believe that the delay caused by obtaining a warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape." *State v. Reed*, 2018 WI 109, ¶93, 384 Wis. 2d 469, 920 N.W.2d 56.

And here, the deputies were dealing not only with an arrest for a misdemeanor crime, but also one that they objectively believed was likely a product of mental illness. (PPFOF 9, 17.) And, they knew the suspect's address, family members, and that this suspect had responsibly participated in the judicial process by showing up in court for a hearing in an earlier disorderly conduct case that very day. (PPFOF 2-3, 6, 23.)

Similarly, there is no "'reasonable suspicion exception' for seizures in the home or the curtilage." *State v. Cundy*, 2023 WI App 41, ¶32-33.; *see also Moore v. Pederson*, 806 F.3d 1036, 1046 (11th Cir. 2015) (it is nonsensical to think an officer could make a warrantless *Terry*-like-stop on articulable suspicion in a home, when an officer is not allowed to make a warrantless arrest in a home on probable cause that a crime has been committed.)

Therefore, Defendants would need to show an emergency in the lines of a significant threat to officer or subject safety – one that was *not unreasonably created by them* - that was so dire it left no time to secure a warrant. True, Plaintiff was somewhat drunk in his bedroom and Plaintiff was in possession of lawfully owned guns consistent with this Second Amendment rights, but this is not uncommon in a typical American home, and to say that these circumstances constitute an emergency that vitiates the warrant requirement of the Fourth Amendment would be to permit the government to intrude into countless American homes. And, Plaintiff was growing increasingly agitated at the violation of his rights, but this cannot be the basis for exigency because exigent circumstances are unavailable where an officer's *unreasonable* conduct has *created* the exigency. *Kentucky v. King*, 563 U.S. 452, 461, 131 S. Ct. 1849, 179

L. Ed. 2d 865 (2011). ("the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.") In other words, the "exigent circumstances rule applies [only] when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Kentucky v. King*, 563 U.S. at 469.[5]

### A. Plaintiff's increasingly vociferous refusal to consent to a warrantless at-home arrest and assertion of his constitutional rights are not exigent circumstances, even though he was lawfully in possession of guns that he did not point at himself or officers.

Plaintiff's refusal to consent to the police outside his home is not only not an exigency, but a privileged and reasonable refusal to submit to unlawful police conduct. *See e.g. Welsh v. Wisconsin*, 466 U.S. 740, 744, 104 S. Ct. 2091, 2100, 80 L. Ed. 2d 732 (1984) (arrestee's refusal to submit to a breath test upon an intoxicated driving arrest is *reasonable* when the underlying arrest was not lawful, such that arrestee could not be prosecuted for refusal.) There is a well-established federal common-law right to resist

[5] The *King* Court remanded to the lower court to determine whether the exigency that police used as a basis for their warrantless entry in that case actually existed, but held that if it did, "it would justify the warrantless search because officers did not violate or threaten to violate the Fourth Ament prior to the exigency." *Id*. at 471.

unlawful arrests and other unlawful invasions of private rights. *People v. Trapp*, 335 Mich. App. 141, 163-64, 966 N.W.2d 420 (2020); *United States v. Di Re*, 332 U.S. 581, 594, 68 S. Ct. 222, 228, 92 L.Ed. 210 (1948) ("One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases."); *Hardy v. City of Milwaukee*, No. 13cv769-JPS, 2014 WL 2542756, at *11 (E.D. Wis. June 13, 2014) (same); *Fillyaw v. Tenhaken*, No. 20cv827, 2022 WL 95175, at *5 (E.D. Wis. Mar. 30, 2022) ("A factfinder could reasonably conclude that…[the officers'] detainment of Fillyaw was unlawful, and Fillyaw had a right to resist them.")

To rely on "exigency" as a warrant exception, the Fourth Amendment requires that "the steps preceding the seizure be lawful." *Kentucky v. King*, 563 U.S. at 463, *citing Horton v. California*, 496 U.S. 128, 136-40, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (Explaining that in order to lawfully seize evidence in plain view, officers must not have violated the Fourth Amendment in arriving at the spot from which the observation is made: "It is…an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."); *see also Hawkins v. Michell*, 756 F.3d at 993 (Police are allowed to act upon exigencies of their own making, so long as their conduct in creating the exigency was "reasonable" under the Fourth Amendment).

If the deputies had come upon the house to a person being assaulted or a person unconscious and bleeding, they could rely on such emergency to exempt them from the warrant requirement, but the officers cannot come up on a man sitting in his bedroom and violate his rights until he gets so angry that they can call that anger an emergency.

Here, the officers explicitly disregarded the Plaintiff's assertion of his constitutional rights, and without a warrant, it was unreasonable to do so, and therefore, police cannot rely on any "exigent circumstance" regarding Plaintiff's agitation that police were trespassing and violating his rights. "Police officials are not free to create exigent circumstances to justify their warrantless intrusions." *People v. Trapp*, 335 Mich. App. 141, 159, 966 N.W.2d 420 (2020), *quoting United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984) (occupants of the Morgan house were peaceful until startled by officer).

### B. Concern for Plaintiff's welfare coupled with his access to guns does not constitute exigence circumstances that would do away with the warrant requirement.

In *Caniglia v. Strom*, 593 U.S. 194, 141 S. Ct. 1596, 1600, 209 L. Ed. 2d 604 (2021), the Supreme Court explained quite clearly that a welfare concern would not reasonably permit officers to seize a suspect, occupancy his premises, or seize his guns. In that case, a man had been fighting with his wife, retrieved a gun, and told his wife to shoot him. *Id*. at 196. The officers, believing the man posed a risk to himself or others, called an ambulance to take the man to a hospital for a psychiatric evaluation, and after the man departed, the officers seized the man's two guns. *Id*. at 196-97. The Court held that officers were constitutionally forbidden from shirking the warrant requirement under the Fourth Amendment in service of mitigating or avoiding any risk of a potentially suicidal or otherwise dangerous man having access to guns. *Caniglia v. Strom*, 593 U.S. 194, at 199.

Because the *Caniglia* opinion from the high court is quite concise, it is helpful to review the First Circuit's reasoning that the Supreme Court rejected. The First Circuit had erroneously held that the officers' seizure of the plaintiff had been reasonable and unoffensive to the Fourth Amendment. – This Court should not adopt the First Circuit reasoning that the Supreme Court has rejected:

> Viewed objectively, the facts available to the officers at the time of the seizure place this conclusion well within the realm of reason. The officers knew that the plaintiff had fetched a firearm during an argument and implored his wife to "shoot [him] now and get it over with." They also knew that his behavior had so dismayed his wife that she spent the night at a hotel and requested a wellness check on her husband the next morning because she feared that he might have committed suicide. No rational finder of fact could determine that an officer confronted with this scenario would be acting unreasonably by refusing to shut his eyes to the plaintiff's obvious risk of self-harm.
>
> …
>
> Faced with the unenviable choice between sending the plaintiff to the hospital and leaving him (agitated, ostensibly suicidal, and with two handguns at his fingertips), the officers reasonably chose to be proactive and to take preventive action… Even if the plaintiff intended only a hyperbolic flourish, we cannot say that it was outside the realm of reason for the officers to discern a serious risk of imminent self-harm, given the surrounding factual context: a man had recklessly thrown a firearm, made a desperate exclamation suggesting (at best) a fraught frame of mind or (at worst) a propensity for self-harm, and so unnerved his wife that she hid the magazine for the gun from him, stayed overnight at a hotel, and worried whether her husband might have committed suicide the next morning. Standard police equipment does not include crystal balls. Here, we think it apparent that the officers were amply warranted on objective grounds in concluding that the flashing red lights signaled imminent danger.

*Caniglia v. Strom*, 953 F.3d 112, 127-28 (1st Cir. 2020), *vacated and remanded,* 593 U.S. 194, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021).

The Seventh Circuit came to a similar result in *Hawkins v. Michell*, rejecting the officers' contention that a home arrest was "necessary to prevent imminent serious injury." 756 F.3d at 992. In *Hawkins*, the officers arrived at a disorderly scene, and had been told that Hawkins had some history of abusing his girlfriend – who called 911 in this instance. *Id.* at 993. The officers knew that Hawkins "gets violent sometimes," the couple "was in a drunken spat, and clothing was strewn around the front yard," but also that the insults of that evening had been verbal and not accompanied by physical attack, the two had separated, and there were no weapons involved.[6] *Id.* at 993.

The girlfriend reported that Hawkins had locked her out, and she needed her keys so she could leave. *Id*. at 988. When the officer arrived, he saw that Hawkins had thrown the girlfriend's clothing out in the yard, both parties were outside and Hawkins was screaming at the girlfriend that, "I don't have your fucking keys." *Id*. at 988. Hawkins then retreated into his house, slamming the door behind him. *Id*. The officer knocked on the door, and Hawkins yelled "I don't need to talk to you!" then attempted to close the door. *Id*. However, the officer stuck his foot in the path of the door to prevent it fully closing, and then entered the home. *Id*. Hawkins made it clear that he wanted law enforcement gone as they did not have a warrant. *Id*. Hawkins, on his attorney's advice, told the officer to "get the fuck out of the house," repeatedly. *Id*. Officers instructed Hawkins that he had to speak to them because his girlfriend had called 911. *Id*. Hawkins disobeyed and yelled commands at the officers. *Id*. The

---

[6] The obvious distinguishing fact is that there were no weapons involved in *Hawkins*, however, that does not discount the holding in *Caniglia v. Strom* where there was a gun involved.

officers told Hawkins if he did not comply, he would be arrested – and ultimately a struggle ensued as the officers brought Hawkins to the ground and arrested him. *Id*. at 989.

The Seventh Circuit held that while it was reasonable for officers to knock on the door to investigate from a publicly accessible area and attempting to initiate a consensual conversation, the officer's warrantless home entry after that was *unreasonable,* even if Hawkins was yelling and "'screamed' in terror upon discovering a police officer at his door, and then attempted to close the door on the officer." *Hawkins v. Michell*, 756 F.3d at 993. The Seventh Circuit was clear that fact that the suspect was drunk, repeatedly and vociferously objecting to officers presence, and assertively stood on his rights without physical aggression, could not amount to an exigency. *Id.* at 994. The officers could not, consistent with the constitution, "responded to Hawkins's nonthreatening disobedience by telling him that if he didn't get off the phone [at his home] and speak to the officers, he would be arrested." *Id.*

## X. Defendants are not entitled to qualified immunity.

### A. Qualified immunity standard.

"Qualified immunity shields federal and state officials from monetary liability unless the law they ostensibly violated was clearly established at the time of the alleged offense." *Taylor v. Schwarzhuber*, 132 F.4th 480, 486 (7th Cir. 2025). While the "plaintiff bears the burden of establishing the existence of a clearly established constitutional right, a plaintiff's failure to cite a case on point is not fatal by itself." *Taylor v.*

*Schwarzhuber*, 132 F.4th 480, 487 (7th Cir. 2025) (internal quotation marks and citation omitted).

A right is "clearly established" when every "reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011), *citing Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (officers "can still be on notice that their conduct violates established law even in novel factual circumstances."); *see also Leiser v. Kloth*, 933 F.3d 696, 701–02 (7th Cir. 2019) (a case on all fours is not necessary if "the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law."); *see also Est. of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017) ("While the Supreme Court has warned that we must not define clearly established law at a high level of generality, it has also instructed that there need not be a case directly on point.")

In conducting the clearly established inquiry, the Court looks to the Supreme Court and Seventh Circuit precedent, but if there are not cases providing "adequate guidance to permit the defendants to understand their responsibilities," then the Court must either (a) look to all relevant case law to see if it demonstrates a trend that allows the Court to "say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016); *see also Leiser v. Kloth*, 933 F.3d at 701–02. Or, (b), "consider if this is one of the rare

cases [] where the state official's alleged conduct is so egregious that it is an obvious violation of a constitutional right." *Leiser v. Kloth*, 933 F.3d at 702, *citing Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377–78, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009).

**B. It was clearly established that occupying the curtilage for law enforcement purposes was unreasonable, especially the persistence in the face of non-consent.**

The principal that the area immediately around and associated with the home is "part of the home itself for Fourth Amendment purposes" has "ancient and durable roots." *Fla. v. Jardines*, 569 U.S. 1, 6. And, just several years prior to the deputies' actions here, the Supreme Court made clear that law enforcement could not enter curtilage for law enforcement purposes, without a warrant, even briefly, to simply confirm that what appeared to be the stolen motorcycle police were searching for was, in fact, the stolen motorcycle. *Collins v. Virginia*, 584 U.S. 586, 587, 138 S. Ct. 1663, 1667, 201 L. Ed. 2d 9 (2018). In the case at bar, the deputies did not simply *enter* curtilage for a law enforcement purpose, but stayed there, even when consent was denied and the Plaintiff made requests to terminate the encounter – which makes it all that more clearly unreasonable to remain in the curtilage – whether viewed as seizure through persistence in the face of non-consent, like *U.S. v. Jerez*, 108 F.3d at 691-92, or a search by continuing to obtain information by intruding on curtilage, like *Fla. v. Jardines*, 569 U.S. 1, 5.

### C. A reasonable officer would have known that arresting Dylan inside his home without a warrant was egregiously unreasonable regardless of where the officer was standing, and it was only matter of time before the Seventh Circuit would clearly so hold.

Defendants will likely claim qualified immunity based on the uncertain case law that has cropped up surrounding threshold arrests. In *United States v. Berkowitz*, 927 F.2d 1376, 1386 (7th Cir. 1991), the Seventh Circuit noted that courts "have generally upheld arrests…where the police go to a person's home without a warrant, knock on the door, announce from outside the home the person is under arrest when he opens the door to answer, and the person acquiesces to the arrest." *Berkowitz* has created some confusion as to when exactly a consensual "knock and talk" sheds its consensual nature and becomes a warrantless in home seizure, in violation of *Payton*. Frankly, the scenario in which a suspect voluntarily opens his door to police and is subsequently seized is not before the Court, and the Court need express no opinion on such a situation. In this case – with Dylan never leaving his bedroom – there is no consent to ponder the voluntariness of, just as in *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 690 (7th Cir. 2001).

*Berkowitz* found that a person could surrender to police at a doorway, and that "*Payton* prohibits only a warrantless *entry* into the home, not a policeman's use of his voice to convey a message of arrest from outside the home." *Id*. Read literally and in isolation, an officer could think he could effectuate an arrest of a person inside his home, as long as the officer did not cross the boundary of the four corners of the home to do it.

However, the Seventh Circuit later clarified that holding was limited, explaining that "*Berkowitz* only endorsed as reasonable under the Fourth Amendment, a slight entry into the home to complete an arrest announced outside the home when the individual acquiesced to the entry while standing fractions of an inch behind the threshold of her home with the door open." *Sparing v. Vill. of Olympia Fields*, 266 F.3d at 690. *Sparing* involved an officer entering the home to complete an arrest, and the Seventh Circuit did again speak in terms of entry, finding that for the officer "to enter the home without a warrant, as he did in this case, he first needed Sparing's consent." *Id* at 690-691. But importantly here, the Seventh Circuit also said that *Payton* applied to the in-home arrest: "we apply *Payton*—Sparing did not surrender any reasonable expectations of privacy in his home [because he did not consent or exit his home, and was interacting with officers behind a screen door]. Without a warrant, **this arrest could only be completed if Sparing opened his screen door, and stepped outside of his home or acquiesced to a slight entry to complete the arrest**." *Id*. at 691. (emphasis added.)

The Seventh Circuit recognized that the constitutionality of warrantless at-home arrest cases hinged on a finding of citizen's consent and acquiesce to police. *Id*. 690-91. *Sparing* granted the arresting officer qualified immunity, but sufficiently clarified for future officers that when there was no semblance of consent "voluntarily or otherwise," a warrant would be necessary. *Id*. at 691. *See also State v. Cundy*, 2023 WI App 41, ¶40, 409 Wis. 2d 34, 995 N.W.2d 266 (whatever confusion existed about home arrests where the person presenting to police was arguably consenting, it is clear a person is

unlawfully seized at home "when the officer denied his request to terminate his encounter with the officer at the doorway of his home.")

There are also federal cases that state explicitly that a person cannot be seized inside his home *by officers standing outside the home*, and though those cases are not from the Seventh Circuit, they reflect a trend and show that the Seventh Circuit would reach the same result. Several circuits have made clear that "constructive" in-home arrest or "constructive entry" via officers outside the home seizing a person inside the home, is just as unreasonable as officers inside the home conducting the seizure. *United States v. McGrath*, 700 F. Supp. 3d 233, 243, 246 (M.D. Pa. 2023); *United States v. Saari*, 272 F.3d 804, 806 (6th Cir. 2001); *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984) (police could not arrest suspect and seize his gun when he "appeared at the door holding a weapon in plain view" because "as a practical matter, Moran was under arrest as soon as the police surrounded the Morgan home," and at the moment that seizure occurred, no warrant had been secured.); *United States v. Reeves*, 524 F.3d 1161, 1168–69 (10th Cir. 2008); *People v. Trapp*, 335 Mich. App. 141, 162, 966 N.W.2d 420 (2020) ("The constructive-entry doctrine hinges on the notion that the security promised by the Fourth Amendment is destroyed not only by a physical invasion of governmental actors, but also by official conduct calculated to compel the occupants of a home to submit to their own extraction."); *United States v. Warford*, No. 20-CR-1208 JCH, 2022 WL 17620770, at *25 (D.N.M. Dec. 13, 2022) ("a knock-and-talk encounter can shed its consensual—and constitutional—nature.")

It is *obvious* that the "relevant inquiry is the location of the person being arrested, not the arresting officer." *United States v. Saari*, 272 F.3d 804, 805–12 (6th Cir. 2001), *citing United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984), relying on *United States v. Johnson,* 626 F.2d 753 (9th Cir. 1980). A warrantless arrest accomplished with the *suspect* in his home violates the Fourth Amendment. *Id*.

In *United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980) the Ninth Circuit held that officers could not, from outside, arrest a person inside the home. The Ninth Circuit explained:

> In this case, we are confronted with the situation where the suspect was arrested as he stood inside his home and the officers stood outside his home with drawn weapons. In these circumstances, **it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home. Otherwise, arresting officers could avoid illegal "entry" into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the "reach" of the arresting officers.**
>
> …
>
> In light of the strong language by the Court in *Payton* emphasizing the special protection the Constitution affords to individuals within their homes, we find that the warrantless arrest of Johnson, while he stood within his home, after having opened the door in response to false identification by the agents, constituted a violation of his Fourth Amendment rights.

*United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980) (emphasis added), *aff'd on other grounds,* 457 U.S. 537, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982). While the Supreme Court was weighing in on the issue of retroactive application of law and not on the above grounds, it is perhaps of note that it indicated no qualms with the holding, stating simply that, "Because the Court of Appeals correctly held that the rule in *Payton* should

apply to respondent's case, its judgment is affirmed." *United States v. Johnson*, 457 U.S. 537, 562–63, 102 S. Ct. 2579, 2594, 73 L. Ed. 2d 202 (1982), *abrogated on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987).

Moreover, *United States v. Saari*, 272 F.3d 804, 806 (6th Cir. 2001), making clear that warrantless at-home arrests are unlawful even if the officer does not physically enter the home, was decided one week after the Seventh Circuit granted qualified immunity but clarified for future officers that any warrantless at-home arrest required clear consent in *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 690 (7th Cir. 2001). In 2015, the Seventh Circuit, in *United States v. McMillian*, 786 F.3d 630, 636 (7th Cir. 2015), indicated receptiveness to the holding of *Saari*, stating it was deprived of the ability to consider a litigant's argument that his arrest was unlawful because he was coerced outside at the time of his arrest, pursuant to *Sparing v. Vill. of Olympia Fields,* 266 F.3d 684, 689–91 (7th Cir. 2001), *United States v. Saari,* 272 F.3d 804, 809–10 (6th Cir. 2001), and *United States v. Maez,* 872 F.2d 1444, 1450–53 (10th Cir. 1989), only because the argument had been forfeited below.

In *United States v. Saari*, 272 F.3d 804, 806 (6th Cir. 2001), officers responded to a "shots fired" complaint by first proceeding to speak with the witness/complainant, Ms. Saari, the ex-wife of the suspect. There, they learned shots had not actually been fired, but Mr. Saari had been standing in Ms. Saari's window with a pistol in hand. *Id.* Ms. Saari told the officers that Mr. Saari "was armed at all times," and an unknown source provided information that Mr. Saari had explosives, was heavily armed, and belonged to a militia group. *Id.* at 806. Four officers decided to approach Mr. Saari's house and

make contact. *Id*. Armed with guns and without a warrant, the officers ordered Mr. Saari to come outside. *Id*. at 807. Mr. Saari exited and a gun was removed from his waistband. *Id*.

The Sixth Circuit rejected the government's argument that it "was merely attempting to interview" Saari, and that they "acted reasonably in protecting themselves by having their guns drawn before initiating the interview," and agreed with the district court who correctly recognized what this objectively amounts to: "as a practical matter defendant was under arrest from the inception of his encounter with the officers." *Id*. at 807-08. Despite the information received, Mr. Saari "was peaceably occupying his home when the officers arrived, and there was no proof that anyone was being threatened inside." *Id*. at 810. The "officers' safety did not require them to summon [Saari] out of his house at gun point before obtaining an arrest warrant." *Id*. at 812.

A similar holding was reached in *United States v. Morgan*, 743 F.2d 1158, 1160 (6th Cir. 1984). There, officers responding to shots fired in a park saw Morgan loading guns into his car trunk. *Id*. A passerby warned the officers that Morgan's trunk was full of weapons and they would be shot if they interfered with Morgan and his comrades. *Id*. Officers followed the vehicle to a home and watched men carry the guns inside. *Id*. Once officers had sufficient reinforcement to the scene, they flooded the house with spotlights and called for Morgan to come outside with a bullhorn. *Id*. at 1161. Morgan appeared at the front door with a gun in hand, and when he was ordered to put down the gun, he raised it, before putting it down and coming outside. *Id*. Once outside,

Morgan was arrested and a loaded pistol was found in his pocket. *Id.* Though there was a one to two hour period between the first observation of Morgan at the park and his subsequent arrest, no effort was made to secure a warrant. *Id.* The Sixth Circuit said this violated *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (privacy of home may not be invaded absent warrant or exigent circumstances); *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, (1948) (Fourth Amendment will be reduced to nullity if people's home is secure only in the discretion of police officers who assume that a warrant would be granted on the facts), and *Welsh v. Wisconsin*, 466 U.S. 740, n.10, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). *Id.*

There was no emergency circumstance justifying an exception to the warrant, and the fact that there may have been probable cause for the issuance of a warrant was no excuse to fail to secure one. *Id.* at 1163-1164. "Viewed objectively, Morgan was placed under arrest, without the issuance of a warrant, at the moment the police encircled the Morgan residence," and this violated *Payton* because no warrant had been secured. *Id.* at 1165. "Although there was no direct police entry into the Morgan home prior to Morgan's arrest, the constructive entry accomplished the same thing, namely, the arrest of Morgan." *Id.* at 1166.

When it comes to at-home seizures, the Supreme Court has warned officers that they are not to "render hollow the core Fourth Amendment protection the Constitution extends to the house and its curtilage, and transform what was meant to be an exception into a tool with far broader application." *Collins v. Virginia*, 584 U.S. 586, 587, 138 S. Ct. 1663, 1667, 201 L. Ed. 2d 9 (2018). This is not a claim of excessive force where

the contours of reasonable and unreasonable force are often unexacting such that a reasonable official may not know what is reasonable in a particular circumstance faced. *See Strand v. Minchuk*, 910 F.3d 909, 914–15 (7th Cir. 2018), *citing to Kisela v. Hughes*, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018). *See also Davis v. Allen*, No. 21-CV-565-WMC, 2023 WL 2914807, at *5 (W.D. Wis. Apr. 12, 2023), *appeal dismissed,* 112 F.4th 487 (7th Cir. 2024) ("Of particular importance, courts must apply qualified immunity correctly in excessive force cases, because the results in this area of the law "depends very much on the facts of each case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).") And, the Seventh Circuit in *Sparing* reiterated "what seems to have been lost from our discussion in *Berkowitz*: there was no reason in this case not to get a warrant and every reason to obtain one." 266 F.3d at 691. The Seventh Circuit warned future officers: "When time permits, officers who elect not to obtain a warrant unnecessarily risk the type of constitutional violation involved in this case." *Id.*

Any reasonable officer would know that without a warrant, and without consent, he could neither remain on the premises nor disregard a suspect's request to terminate the counter.

## XI. Conclusion

The Court should grant partial summary judgment to Plaintiff and find as a matter of law, based objectively on the facts established by video camera, Plaintiff's Fourth Amendment right to be secure in his home was violated when the deputies (a) entered and remained in his curtilage in the face of non-consent, and (b) seized Plaintiff

in the home – first by disregarding his request to terminate the encounter, and subsequently by directing his movements at gunpoint – without a warrant.

Dated this Wednesday, July 23, 2025.

Respectfully submitted,

Dylan Hancock,

Plaintiff,

BY

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
ANDREA J. FARRELL
State Bar Number 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone 608/283-6001
Fax 608/283-0945
Email: jsolson@scofflaw.com

/s/Jeff Scott Olson
Jeff Scott Olson
ATTORNEY FOR PLAINTIFFS