In the
# United States District Court
For the
Western District of Wisconsin

DYLAN HANCOCK,

Plaintiff,

Case No. 24-CV-410

v.

BARRON COUNTY, SHERIFF CHRIS FITZGERALD, DEPUTY ERIK SEDANI, DEPUTY CHRISTOPHER WELKER, DEPUTY HEATHER HUGHES, DEPUTY ANDREW KRAHENBUHL and ANTHONY WEIGAND,

Defendants.

---

**Plaintiff's Opposition to Defendants' Motion for Summary Judgment**

---

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
ANDREA J. FARRELL
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone 608/283-6001
Fax 608/283-0945
Email: jsolson@scofflaw.com

Table of Contents

I. Summary Judgment Standard. .......... 1

II. The parties agree that the Defendants' arrest of Dylan inside his home was per se unreasonable, unless a warrant exception exits. .......... 2

III. The Deputies had no license to be on Dylan's property, and cannot rely on exigent circumstances for failing to leave when Dylan asked them to leave while the incident was still "calm." .......... 4

A. Because Defendants violated the Fourth Amendment in entering and remaining on Dylan's curtilage to effectuate a warrantless at-home arrest, the defense of exigent circumstances is unavailable to Defendants. .......... 6

B. Because Defendants were arresting Dylan for misdemeanors, the unreasonableness presumption is difficult to rebut. .......... 9

IV. Even if Defendants could raise exigent circumstances as a defense, they still have failed to prove what the exigent circumstances exception requires them to prove - a compelling need to act in a criminal case and no time to secure a warrant. .......... 10

A. Dylan was not a flight risk, and the Defendants do not develop any argument to suggest that he was. .......... 11

B. Defendants have not shown any alleged potential danger to Dylan's father, Brad Hancock, sufficient to constitute exigent circumstances. .......... 12

V. Defendants may not rely on the community caretaking or emergency aid doctrines for their actions in attempting to gather evidence or make an arrest in a criminal case. .......... 18

A. An objective record review shows Defendants' purpose was to arrest Plaintiff for misdemeanors, at home, without a warrant. .......... 20

B. The argument that there was a "need to intervene before a suicide-by-cop scenario unfolded" is patently unreasonable and cannot support an exigent-circumstances exception to the warrant requirement. .......... 21

VI. The existence of probable cause does not entitle Defendants to qualified immunity, because the case law is clear that even with probable cause, a warrantless at-home arrest is unreasonable. .......... 24

VII. Dylan's privileged refusal to consent to an at-home warrantless arrest cannot constitute an exigency nor can it be considered active resistance to arrest. ............................................. 26

VIII. A dispute of fact as to whether Dylan pointed a weapon at Deputy Weigand prohibits summary judgment and defeats qualified immunity on the claim of excessive deadly force. . 29

IX. A jury could reasonably award punitive damages. ..................................................... 40

X. A jury could find for Plaintiff on Title II ADA violations. ............................................ 43

XI. A jury could find *Monell* liability. .................................................................... 56

A. Defendant Sheriff Fitzgerald had personal involvement. ........................................... 56

B. The obvious consequence of an arrest policy that in no way restricts officers from conducting routine at-home warrantless arrests is that officers will unconstitutionally arrest people at home on probable cause alone, in violation of the Fourth Amendment................ 60

Conclusion ........................................................................................................... 63

**I. Summary Judgment Standard.**

While Defendants generally state the correct standard for summary judgment, some additional principles should be kept in mind. A "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion…" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992) ("The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each.") Plaintiffs can only respond to issues raised by Defendants.

Moreover, "it is worth emphasizing that the non-moving party does not bear the burden of proving his case; the opponent of summary judgment need only point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011).

In the Seventh Circuit, on "summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Runkel v. City of Springfield*, 51 F.4th 736, 741-42 (7th Cir. 2022) (highlighting "the court's limited role when considering a motion for summary judgment" as it does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." (citation omitted.))

The objective reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," so it has been "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Abdullahi v. City of Madison* 423 F.3d 763, 773 (7th Cir. 2005).

Finally, deadly force cases must not focus solely on the moment of the shooting. The totality of the circumstances, including the reasonableness of preceding steps of law enforcement, must be taken into account. *Barnes v. Felix*, 145 S. Ct. 1353, 1358, 221 L. Ed. 2d 751 (2025) (the fact finder must sift through the entire totality of the circumstances when determining if deadly force was ultimately reasonable, and not restrict its scrutiny to just the moment of the shooting); *Kentucky v. King*, 563 U.S. 452, 463, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (officers cannot rely on exigency of their own unreasonable making).

## II. The parties agree that the Defendants' arrest of Dylan inside his home was per se unreasonable, unless a warrant exception exits.

In this case, the Defendant deputies came to Dylan's house to make a warrantless misdemeanor arrest. (PAPFOF 21-29, 33.) When Dylan remained in his bedroom and stood on his constitutional rights, telling the deputies he would not consent to arrest and they should leave, the Defendants did not. (PAPFOF 36-49.) Instead, they remained in his constitutionally protected curtilage – occupying the space just outside Dylan's bedroom window and refused to leave, at times pointing guns at him, though Dylan undisputedly never pointed a gun at them. (PAFOF 36-55, 83.) This culminated

in a brief (and unconstitutional) standoff between Dylan, in his bedroom, and the deputies outside, ending when Deputy Weigand arrived on scene and without warning Dylan or giving him any opportunity to comply, shot Dylan through his bedroom window because Dylan was holding a gun and threatening suicide. (PAPFOF 58-80.)

Plaintiff has moved for partial summary judgment (dkt. 26) on the issue of the violation of the Fourth Amendment's "very core" – "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Hawkins v. Mitchell*, 756 F.3d 983, 991 (7th Cir. 2014), *citing Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); *see also Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (warrantless at-home arrests are presumptively unreasonable); *Caniglia v. Strom*, 593 U.S. 194, 198, 141 S. Ct. 1596, 1600, 209 L. Ed. 2d 604 (2021) (reaffirming the "very core" of the Fourth Amendment's guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *Welsh v. Wisconsin*, 466 U.S. 740, 754, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984) (there is a "special protection afforded the individual in his home by the Fourth Amendment.") This special protection applies to the home's curtilage just as robustly as it does within the four walls of the home itself – including the side yard just outside one's bedroom window. *Collins v. Virginia*, 584 U.S. 586, 592, 138 S. Ct. 1663, 1667, 201 L. Ed. 2d 9 (2018); *Fla. v. Jardines*, 569 U.S. 1, 5, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). Of course law enforcement may knock on someone's front door to ask if the occupant wants to voluntarily cooperate with police, just as a simple trick-or-treater could knock and ask for the occupant to voluntarily produce a gift of candy, but an

officer may do no more than any "private citizen might do," and, absent invitation to stay, officers must leave. *Kentucky v. King*, 563 U.S. 452, 469, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011); *U.S. v. Jerez*, 108 F.3d 684, 691-692 (7th Cir. 1997) (any law enforcement persistence in the face of refusal requires warrant or exigent circumstances); *State v. Cundy*, 2023 WI App 41, ¶27, 409 Wis. 2d 34, 995 N.W.2d 266 (officers' refusal of person's request to terminate an at-home encounter is unreasonable absent warrant or exigent circumstances); *State v. Wilson*, 2022 WI 77, ¶ 31, 404 Wis. 2d 623, 636, 982 N.W.2d 67, 74.

The Defendants' summary judgment submissions make it clear that the Plaintiff and the Defendants agree that Defendants' "warrantless search or seizure" in the case at bar was "per se unreasonable," unless an exception to the Fourth Amendment's warrant requirement existed. The Defendants say the exception applicable here is "exigent circumstances." (Dkt. 30, p. 5.)

## III. The Deputies had no license to be on Dylan's property, and cannot rely on exigent circumstances for failing to leave when Dylan asked them to leave while the incident was still "calm."

Defendants argue that their "warrantless attempt to arrest Plaintiff at his home was supported by [three] exigent circumstances: (1) potential harm to himself or others, (2) risk of flight or escalation, and (3) the need to intervene before a suicide-by-cop scenario unfolded." (Dkt. 30, p. 9.) Specifically, Defendants argue this incident "began as a calm encounter" and alleged that it "unexpectedly escalated into an armed physical altercation when Hancock raised his gun and pointed it out of his bedroom window at

Deputy Weigand." (Dkt. 30, pp. 1-2.) Even if the latter contention (which a jury could reject – PPFOF 83) were true, it is the Defendants' version of the *end* of this incident, when Weigand fired two shots into Dylan's home, hitting and paralyzing Dylan inside. (PAPFOF 76-80.) Defendants do not even attempt to explain why they believed that *prior to this climactic point*,[1] when it was still "a calm encounter," deputies did not simply leave when Dylan first communicated that he would not consent to come outside. At that point they had to know that they would need a warrant to effect Dylan's arrest.

This is a major fallacy in Defendants' argument, because in "determining reasonableness, we 'carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999), *citing Plakas*, 19 F.3d a1143, 1150 (7th Cir. 1994). In determining the constitutional validity of a seizure, courts look to the information the officers had at the moment the decision was made. *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964).

Defendants do not provide any reason why they did not get a warrant in the first place, and do not explain why they did not simply leave and get one when Dylan asked them to leave – when the scene was still, in Defendants' words – "calm." The totality of relevant circumstances includes only those facts known to the officers at the time and

---

[1] Defendants also make the parallel argument that there was probable cause for a felony arrest at the moment of deadly force when Weigand claims Plaintiff threatened him with a weapon. (Dkt. 30, p. 21.) However, Defendants know this fact is disputed. Moreover, even under the defense version of the facts anything Dylan did just before the shooting that ended the incident cannot possibly justify the earlier actions of the Defendants.

cannot be based on after-acquired evidence. *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003).

It is clear that absent a warrant, law enforcement may "do no more than any private citizen might do," *Kentucky v. King*, 563 U.S. at 469, and typically this means "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Fla. v. Jardines*, 569 U.S. 1, 8; *see also U.S. v. Jerez*, 108 F.3d 684, 691-692; *Collins v. Virginia*, 584 U.S. 586, 592; *United States v. McGrath*, 700 F. Supp. 3d 233, 244 (M.D. Pa. 2023) ("Ordinary visitors" do not "stand[] at side windows, peering inside with flashlights."); *State v. Wilson*, 2022 WI 77, ¶ 31, 404 Wis. 2d 623, 636, 982 N.W.2d 67, 74 ("Stated simply, private citizens would not feel they had an implicit license to enter the backyard—and neither would a Girl Scout in the words of the *Jardines* Court.")

**A. Because Defendants violated the Fourth Amendment in entering and remaining on Dylan's curtilage to effectuate a warrantless at-home arrest, the defense of exigent circumstances is unavailable to Defendants.**

Where a law enforcement officer seeks to rely on "exigency" as a warrant exception, the Fourth Amendment requires that "the steps preceding the seizure be lawful." *Kentucky v. King*, 563 U.S. at 463, *citing Horton v. California*, 496 U.S. 128, 136-40, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (Explaining that in order to lawfully seize evidence in plain view, officers must not have violated the Fourth Amendment in arriving at the spot from which the observation is made: "It is…an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate

the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."); *see also Hawkins v. Mitchell*, 756 F.3d 983, 993 (7th Cir. 2014) (Police are allowed to act upon exigencies of their own making, so long as their conduct in creating the exigency was "reasonable" under the Fourth Amendment).

Dylan said, in no uncertain terms: "**I would ask you guys to leave** and stop harassing me," to which they responded, "**I'm not going to leave until we get done talking to you.**" (PPFOF 38-41, 47.) But the deputies had no *license* to do this, and Dylan had every right to refuse to consent. *Kentucky v. King*, 563 U.S. at 469 (law enforcement may rely on consent only when it is "freely given"); *U.S. v. Jerez*, 108 F.3d 684, 691-692 (7th Cir. 1997) (any law enforcement persistence in the face of refusal requires warrant or exigent circumstances); *State v. Cundy*, 2023 WI App 41, ¶27, 409 Wis. 2d 34, 995 N.W.2d 266 (officers' refusal of person's request to terminate an at-home encounter is unreasonable absent warrant or exigent circumstances.)

To the extent exigent circumstances later developed through Dylan's risk of suicide by cop, and the Plaintiff does not concede this, Defendants may not rely on that for a defense, because it was Defendants who initially and recklessly violated Dylans' Fourth Amendment rights. *Kentucky v. King*, 563 U.S. 452, 461, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011). ("the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.") In other words, the "exigent

circumstances rule applies [only] when the police do not gain entry to premises by means of an actual *or threatened* violation of the Fourth Amendment." *Kentucky v. King*, 563 U.S. at 469 (emphasis added); *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir.1993) (holding that an officer violates the Fourth Amendment if he "unreasonably create[s an] encounter" in which an individual would be "unable to react in order to avoid presenting a deadly threat to [the officer]"); *see also Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996) (noting that if an officer fails to identify himself the normal rules governing the use of deadly force are modified, noting the Sixth Circuit's rule that an officer violates the Fourth Amendment if he "unreasonably create[s an] encounter that [leads] to a use of force"); *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 483 (7th Cir. 2015) (giving qualified immunity to officer for claim that he was liable for violating the Fourth Amendment solely by unreasonably creating a situation that led to the use of deadly force, but not for the use of deadly force itself, in part because the unreasonable pre-seizure conduct was relevant to the determination of whether the use of force was ultimately reasonable or not.)

Here, the officers did not come upon a chaotic scene or have valid fears about destruction of evidence – they came upon a man sitting in his bedroom asserting his constitutional rights. (PAPFOF 36-38.) The officers cannot come up on a citizen and violate his rights until he gets so angry that they can call that anger an emergency. Here, the officers explicitly disregarded the Plaintiff's assertion of his constitutional rights, and without a warrant, it was unreasonable to do so, and therefore, police cannot rely on any "exigent circumstance" regarding Plaintiff's agitation that police were

trespassing and violating his rights. "Police officials are not free to create exigent circumstances to justify their warrantless intrusions." *People v. Trapp*, 335 Mich. App. 141, 159, 966 N.W.2d 420 (2020), *quoting United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984) (occupants of the Morgan house were peaceful until startled by officer).

### B. Because Defendants were arresting Dylan for misdemeanors, the unreasonableness presumption is difficult to rebut.

While the seriousness of the underlying crime can make it more reasonable to believe that there is an exigent need, law enforcement activity targeting even the most serious of crimes requires compliance with the Fourth Amendment. *U.S. v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) ("there is no general exception from the Fourth Amendment for searches of homicide scenes.") And, "when the underlying offense for which there is probable cause to arrest is relatively minor," "typically a misdemeanor," the "presumption of unreasonableness is difficult to rebut." *Hawkins v. Mitchell*, 756 F.3d 983, 992 (7th Cir. 2014), *citing Welsh,* 466 U.S. at 750, 752–54, 104 S.Ct. 2091, and *Reardon v. Wroan,* 811 F.2d 1025, 1028 (7th Cir. 1987) (per curiam). As it is undisputed that only misdemeanors - domestic in nature and mental illness related – were of interest to law enforcement, an exigency defense is hardly available to them. (PAPFOF 20-29.)

## IV. Even if Defendants could raise exigent circumstances as a defense, they still have failed to prove what the exigent circumstances exception requires them to prove - a compelling need to act in a criminal case and no time to secure a warrant.

Despite its unavailability to them because they unreasonably created any exigency, Defendants rely on the exigent circumstances doctrine, which unlike the community caretaker doctrine, applies when "there is reason to believe that something criminal is afoot." *Sutterfield v. City of Milwaukee,* 751 F.3d 542, 560 (7th Cir. 2014). This exception "is defined by a time-urgent need to act that makes resort to the warrant process impractical" and applies only when there is no time to seek a warrant. *Id.*, 751 F.3d at 559-60. It applies when there is a need to act *immediately* – such by preventing a fleeing suspect or preserving evidence that might otherwise be destroyed. *Id.* at 560. The exigent circumstances exception applies to scenarios where drugs could be easily flushed in the time it would take to secure a warrant (*Kentucky v. King*, 563 U.S. 452, 461, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011)), where a dangerous criminal is likely to evade capture without immediate apprehension (*Lange v. California*, 594 U.S. 295, 302, 141 S. Ct. 2011, 2017, 210 L. Ed. 2d 486 (2021)), where a homicide victim might be still be able to be resuscitated inside (*United States v. Richardson*, 208 F.3d 626, 629–31 (7th Cir. 2000)), or when there is a crime in process that could be mitigated (*United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003)).

"In those circumstances, the delay required to obtain a warrant would bring about some real immediate and serious consequences—and so the absence of a warrant is excused." *Lange v. California*, 594 U.S. 295, 302 (quotation marks and citation omitted).

Here, Defendants cannot show exigency because they provide zero reason they could not get a warrant in the more than an hour between the complaint made by Dylan's uncle, Wolff, and their arrival at Dylan's home, where Dylan was locked in his bedroom, to arrest him. (PAPFOF 15, 29, 71.) *See Dunn v. Secord*, No. 15-CV-430-BBC, 2016 WL 5173417, at *4–5 (W.D. Wis. Sept. 21, 2016) ("Particularly because plaintiff was in a locked bedroom, it is not clear why defendants would believe that there was a 'compelling need to act and no time to obtain a warrant.' *Sutterfield*, 751 F.3d at 557.")

### A. Dylan was not a flight risk, and the Defendants do not develop any argument to suggest that he was.

One exigency Defendants claim is that Dylan was a risk of "flight or escalation," but they do not, in any way, through facts or law, develop that argument, such that it is waived. *Krebs v. Graveley*, 861 F. App'x 671, 673 (7th Cir. 2021). The proposition that Dylan was believed to be a flight risk is not at all credible – the Defendants knew that Dylan had family ties to the community and was even the nephew of a Town Board Supervisor. (*See e.g.* PAPFOF 5, 7, 9-14.) And, they knew they had arrested him for disorderly conduct a couple months earlier, and Dylan had responsibly made his required court appearance on that charge that very day. (PAPFOF 7-14, DPFOF 33.) The picture painted by the facts portrays the very opposite of a flight risk. *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985) (flight risk exists when someone has no ties to the community, is liquid enough to run, and is unlikely to appear in court if required). The problem these deputies faced was not that Dylan was likely to leave his home – it was that he was almost certainly *not* going to voluntarily leave his home. Finally, as

mentioned above, the Defendants waited more than an hour before going to Dylan's house (PAPFOF 15-29) – leading to the conclusions both that they knew Dylan was not a flight risk and that there was time to secure a warrant prior to attempting to arrest him at home. *Mason v. Green County*, 451 F. Supp. 3d 984, 990-91 (W.D. Wis. 2020) ("An hour had already passed since plaintiff had been seen, and defendants do not explain persuasively why waiting a few more minutes would have presented an unacceptable safety risk.").

### B. Defendants have not shown any alleged potential danger to Dylan's father, Brad Hancock, sufficient to constitute exigent circumstances.

The other exigency Defendants claim is a danger to Brad Hancock, Dylans' father who was in the house with him. (Dkt. 30, p. 8.)[2] First, as explained above, Defendants' argument in this regard should be rejected, because any potential danger to Brad was caused by the Defendants' violation of Dylan's Fourth Amendment rights in the first place, since there is certainly no evidence that Dylan was a threat to Brad when the deputies arrived, and Dylan only became agitated when the Defendants refused to respect his constitutional rights.

---

[2] Defendants also assert a vague claim of danger to the community at large, but they do not actually develop this argument. The Court can quickly do away with Defendants arguments about the alleged risk to others, because it is based on an entirely unsupported factual assertion that Dylan "had access to an automatic rifle and was pointing it outside his window at times" (Dkt. 30, p. 8.) But, *no one* claims that Dylan was pointing a gun outside his window at any time – that is, except for Weigand at the moment of the shooting – which is when this incident (and Dylan's ability to independently move his body below his shoulders) ended.

Second, the Defendants' argument that law enforcement had to act without a warrant because there was an objective concern for Mr. Hancock's safety, is plainly incompatible with their assertion that Mr. Hancock was a willing participating with his son in the "barricade" situation. (DPFOF 89.)

It is also incompatible with Defendants' actions on scene, where they allowed Mr. Hancock to be alone and negotiating with his son, in the "house full of guns" for approximately 15 minutes while deputies stood around outside doing *nothing* expect for occasionally pointing guns at the Hancock home, where both Dylan and Brad were inside. (PAPFOF 66.)

It is also incompatible with Brad's appearance on body camera, where he appeared calm, collected, and expressed a desire to stay inside on the occasions he did come out to give deputies an update. (PAPFOF 67.)

It is also incompatible with the fact that Deputy Sedani *told Brad to go inside the house and get Dylan's guns* and bring them out, and almost immediately thereafter, Weigand fired two rounds into the house. (DPFOF 106, PAPFOF 68, 71-72.) The evidence shows that on occasion, Brad would come outside and check in with the deputies, and, when he did, he appeared calm, collected, and expressed a desired to stay inside. (PAPFOF 67.) If the deputies outside the house would have feared for Brad's safety at Dylan's hands, they obviously would not have permitted, let alone *ordered* him to go back inside on these occasions. (PAPFOF 68.) The Court should find that any suggestion that a reasonable officer would have feared for Brad's safety at

Dylan's hands is ludicrous, but even had such a fear been reasonable, the deputies had created any danger to Brad by sending him back into the house.

Defendants' argument is ironic in that the only actual threat to Mr. Brad Hancock's life was when Sedani ordered Mr. Hancock to go into to the house, and thus into the line of fire, alone, to remove Dylan's guns, seconds before Weigand fired two rounds into Mr. Hancock's home, rendering Mr. Hancock's son, Dylan, a quadriplegic. (DPFOF 106, PAPFOF 68, 71-72, 76.)

Third, the cases Defendants cite do not come close to suggesting that a potential safety risk to Mr. Hancock rose to the level of exigent circumstances. Defendants suggest the objective facts would lead a reasonable officer to believe someone, like Dylan's father, inside the home needed "immediate aid," citing *United States v. Richardson*, 208 F.3d 626, 629–31 (7th Cir. 2000). (Dkt. 30, pp. 5-6.) However, *Richardson* found exigency, in "a very close case," when the officers were responding to a 911 call where the caller identified himself and reported that a homicide had taken place and there was a corpse in the house. *Id.* at 630-31. The "exigency" was that what a lay person describes as a "corpse" could very well be a person still alive but "hovering on the verge of death" *id.*, 208 F.3d at 631, that might still respond to medical intervention, and as such the close call came down in favor of finding the exigency exception to a warrant existed. *Id*. In the case at bar, the deputies knew that Mr. Hancock was well and doing what he wanted to be doing – comforting his upset son – and they allowed him to do so, even ordering Mr. Hancock back in the house to get Dylan's guns seconds before they shot *into the house*. (DPFOF 106, PAPFOF 68-72.) There was no reasonable belief

that Mr. Hancock, or anybody else, was injured or on the verge of death – deputies cannot reasonably order a parent inside with their child, and then *use deadly force on the child* seconds later, citing concern for the parent inside. That is not only unreasonable, it is cruel.

Mr. Hancock was never reported to be a "victim." The alleged "victim" – "Uncle Tony" Wolff – was known to be safely in his own home (DPFOF 16) while Dylan was in *his* own bedroom. These facts did not eliminate all possibility of danger (which government agents may concededly desire, subjectively), but, on balance, weighed against the individual's constitutional rights, they cannot constitute an "exigency" exception to the warrant requirement. *See e.g. Mason v. Green Cnty.*, 451 F. Supp. 3d 984, 993 (W.D. Wis. 2020)[3] (Rejecting Defendants argument of exigent circumstances created by the need to protect victims when the "victims of his earlier domestic abuse, his daughter and his parents, were in his parents' home, being watched by police officers.")

Similarly, Defendants cite *Hanson v. Dane County*, 599 F. Supp. 2d 1046, 1053-54 (W.D. Wis. 2009), for the principle that a 911-hang-up call with an unanswered call back can be an exigency. However, in *Mason v. Green Cnty.*, 451 F. Supp. 3d 984, 993 (W.D. Wis. 2020), this Court explained that *Hanson* is inapplicable to cases like the case at bar –

[3] In *Mason*, officers knew that Mason's daughter called 911 to report a verbal and physical domestic dispute, Mason's location was unknown, and he had threatened to return with a loaded gun and had access to firearms. *Id*. When officers responded to Mason's home there was a vehicle suggesting someone might be home, but no one responded when officers knocked on the door. *Id*. Defendants argued that Mason could have been an imminent threat to his family and the surrounding community. *Id*. Judge Crabb found this to be objectively unreasonable as a matter of law, and found that the officers were not entitled to qualified immunity. *Id*. at 992-994. In fact, Judge Crabb found that not even Wisconsin's "community caretaking interest implicated by the situation – protection of plaintiff's parents and daughter from potential violence" would allow a reasonable officer to *mistakenly believe* he needed to enter and search plaintiff's home, because the "exigency was low, and there were feasible alternatives." *Id*. at 994.

the "lack of an answer on the return of an incomplete emergency call implies that the caller is unable to pick up the phone because of injury, illness or a threat of violence." *Mason* at 990-91, *discussing Hanson*. *Mason* explained that an exception for officers reasonably believing someone is presently suffering injury or threat of violence does not suggest a more general "safety" exception to the Fourth Amendment. *Id.* Rather, exigent circumstances means there must be objective reasons to believe "that there was a compelling need to act and no time to obtain a warrant." *Id*. at 990. In *Mason*, in 2020, this Court found that it was "clearly established" that any showing of exigent circumstances required evidence of the need to "render emergency assistance to an injured occupant or to protect an occupant from *imminent* injury," and so the defendants were not entitled to qualified immunity. *Id*. at 992. (emphasis added.)

Defendants also cite *Brigham City, Utah v. Stuart*, 547 U.S. 398, 406, 126 S. Ct. 1943, 1949, 164 L. Ed. 2d 650 (2006), where the Court applied the emergency aid doctrine as a subset of the exigent circumstances doctrine. (Dkt. 30, p. 9.) In that case, as officers walked up to a loud and tumultuous party, at 3 a.m., they heard thumping, crashing, people yelling "stop" and "get off me," saw a juvenile' being physically held back from fighting, and an adult being struck in the face and spitting out blood. *Id*. The *Brigham* "Court recognized that the need to assist a person who is seriously injured or who is threatened with such an injury is one type of exigency that obviates the need to obtain a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 559 (7th Cir. 2014) (discussing *Brigham*). The "officers witnessed a fracas ongoing within the home that had already resulted in injury to one of the occupants. The officers consequently had reason to

believe both that the person who had been struck might need help and that the fight might continue without intervention." *Id.* at 558-59. And, while some "occupants of the house ultimately were arrested and charged with criminal offenses, the relevant point vis-à-vis the warrantless entry was that immediate action was required in order to protect someone from harm." *Id.* at 565. In the case at bar, Defendants admit to the Court that this "began as a calm encounter" (dkt. 30, p. 1), and there are no allegations of active fighting between occupants, or any injury, let alone a bloody one. Again, to the contrary, these deputies *advised Mr. Hancock to go inside to deal with his son* – and they cannot now rely on the fact that Mr. Hancock was inside as an exigency. (Plaintiff's Responses to DPFOF 105-106, PAPFOF 68.)

Similarly, Defendants cite *U.S. v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005) (Dkt. 30, p. 9), but this Court has previously explained that *Kempf* involved police entering "without a warrant because they believed reasonably that someone had been shot inside" which bears no resemblance to an officers' vague allegation of general safety concerns in the case at bar.

Finally, Defendants cite *Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009). (Dkt. 30, p. 9.)[4] That case is inapposite. The parties in *Fisher* agreed that there were

---

[4] It is also worth mentioning that Defendants elsewhere rely on *Holzman v. City of S. Bend*, No. 3:05-CV-316RM, 2006 WL 2788587, at *3 (N.D. Ind. Sept. 25, 2006), which reached a different conclusion than the Ninth Circuit. In *Holzman*, the officers had exigent circumstances when they arrived, but the new information they received on scene mitigated the exigent nature of the incident, and so officers had to amend their response. *Holzman* is in line with Seventh Circuit precedent, Defendant's reliance on the Ninth Circuit notwithstanding. *See e.g. Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 524 (7th Cir. 2012) (reasonableness requires that officers consider subsequent information to adjust their response, and does not permit police to continue acting on their original assumption: "Even if some understandable confusion and caution remained,

"exigent circumstances" because when police first encountered the plaintiff he was "pointing a rifle" at others and arranging loaded rifles strategically throughout his apartment to shoot police. *Id.* at 1075. The issue in that case was simply whether exigent circumstances could evaporate in the middle of an encounter such that Plaintiff's "continued seizure and the completion of his arrest" would be unreasonable, and the Ninth Circuit answered no, finding " Fisher was seized at the beginning of the standoff, the officers were not required to periodically reassess whether the exigency persisted throughout the standoff because the standoff was 'no more than an actual continuation' of the initial seizure." *Id.* at 1075-76. This case has no bearing here, because the opposite occurred – there was no exigent circumstance at the time an unconstitutional warrantless search and seizure on the curtilage occurred, and the only arguable exigent circumstances developed later, *as a result of law enforcement's reckless disregard of the Fourth Amendment.*

## V. Defendants may not rely on the community caretaking or emergency aid doctrines for their actions in attempting to gather evidence or make an arrest in a criminal case.

Defendants also make a community caretaking[5] argument – that they were there to protect Dylan from his threat of suicide by cop as had been reported by his uncle.

we conclude that a reasonable officer would have been alert to the potential need to mitigate force in arresting the driver. The officers' certainty that they were dealing with a car theft was objectively unreasonable in light of the contrary information they received.")

[5] Prior to the events at issue here, the Supreme Court limited any "community caretaker" exception to the warrant requirement to vehicles, in *Caniglia v. Strom*, 593 U.S. 194, 199, 141 S. Ct. 1596, 1600, 209 L. Ed. 2d 604 (2021). But it remains the law that "In an exigent circumstance often referred to as an 'emergency-aid' situation, government officials may enter a home

(DPFOF 4.) Defendants make the ironic argument that in order to mitigate the possibility of Dylan being shot by a deputy, armed deputies had to descend on Dylan's home with guns pointed directly at him. The risk of suicide-by-cop is the only risk the Defendants claim existed prior to their arrival, as, earlier, Dylan's family members had told the deputies that they were concerned that Dylan would commit "suicide by cop." (Dkt. 30, p. 6.)

It is true that in addition to their law enforcement role, police sometimes play a serve and protection role, and in that latter role there are some exceptions to the warrant requirement, such as the community caretaking exception and the emergency circumstances doctrine. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557-58 (7th Cir. 2014) (applying the emergency circumstances doctrine.). The community caretaking exception, however, does not apply to the home – only to public roadways. *Caniglia v. Strom*, 593 U.S. 194, 196, 141 S. Ct. 1596, 209 L.Ed. 2d 604 (2021). And, the emergency aid doctrine allows a warrantless intrusion into the home when there is an "urgent purpose other than to arrest a suspect or to look for evidence of a crime," generally to render assistance to persons in immediate need of aid. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557, 561 (7th Cir. 2014). Because Defendants were undisputedly acting in a criminal law enforcement capacity in this case – compiling evidence of a suspected

---

without a warrant "to 'render assistance or prevent harm to persons or property within.' " *Gaetjens v. City of Loves Park*, 4 F.4th 487, 493 (7th Cir. 2021), citing *Sutterfield*, 751 F.3d at 558, quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994).

misdemeanor crime and attempting to make an at-home arrest of the suspect – neither is available here. (PAPFOF 20-29.)

### A. An objective record review shows Defendants' purpose was to arrest Plaintiff for misdemeanors, at home, without a warrant.

The Court determines the officer's purpose based on what it objectively appeared law enforcement was there to do. *Fla. v. Jardines*, 569 U.S. at 10. (While officer intent is cannot render a reasonable search unreasonable or vice versa, whether the officer had license to enter the curtilage "depends upon the purpose for which they entered.") After determining that seizure of Dylan is what the deputies' "behavior objectively reveals a purpose" to do, the Court decides whether an objectively reasonable officer would think they had an implied license to do that. *Fla. v. Jardines*, 569 U.S. 1, 10.

As an initial matter, Defendants at times feebly argue that their goal was "to ensure no harm came to Plaintiff" due to "family members' concern for his mental health and the fact that Plaintiff had possession of a firearm in his room." (Dkt. 30, p. 8.) Othan this unsupported subjective statement of Defendants that is *contrary to what they wrote in their police reports*, there is no evidence for this. All the evidence shows that clearly, and objectively, the deputies were conducting a search and seizure as those terms are used under the Fourth Amendment. (PAPFOF 20-29.) The deputies told Dylan's uncle, the complainant, outright that they would go to Dylan's house to attempt to get him to come outside for a warrantless misdemeanor arrest, and that if Dylan would not voluntarily exit, they would extract him with a ERT/SWAT team. (PAPFOF 24-26.) The deputies can recall discussing the plan for a misdemeanor arrest,

but have no cohesive recollection as to whether they discussed the suicide possibility. (DPFOF 27-28.) The deputies did not respond to the Hancocks' home with any degree of urgency; they took more than an hour to get there, indicating the lack of any emergency. (PAPFOF 15, 29.) And, after getting there, the deputies continued doggedly in their plan to extract Dylan from his home so they could seize him, calling out the ERT/SWAT unit when he did not voluntarily exit, just as they had earlier planned. (DPFOF 81-89 20-29; PAPFOF 36-50.)

### B. The argument that there was a "need to intervene before a suicide-by-cop scenario unfolded" is patently unreasonable and cannot support an exigent-circumstances exception to the warrant requirement.

Because law enforcement must be present to enable a person to die by "cop," it is nonsense to say that thoughts of "suicide by cop" are an emergency requiring police intervention. Actually, it is the opposite, because nobody's aspiration to commit suicide by cop can come to fruition without the cops' arrival, and the Defendant deputies knew that by their arrival, they would *create* the emergency that could not exist without their involvement. Law enforcement officers are *necessarily* the indispensable half of the suicide by cop equation. *See e.g. Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010–11 (E.D. Wis. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015) ("a reasonable officer would have known that there is a high likelihood that a suicidal person will respond to an officer's show of force with an action that is likely to provoke the officer to use deadly force, as the person may wish to commit 'suicide by

cop.'…In light of these risks, Blanchard needed to have a compelling reason to enter Brown's bedroom with his gun drawn.").

Moreover, Defendants misconstrue the caselaw. They conflate the emergency aid or welfare doctrine, (as applied in *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014) to a Chapter 51 arrest to attempt to protect a woman from suicide) with exigent circumstances when officers are acting in their criminal enforcement function. For example, Defendants claim that the law affords them "an extra degree of deference" when responding to a "report of a possible suicidal subject" (dkt. 30, p. 6), but the case they cite for this principle actually says that police have an extra degree of deference to believe there is an exception to the warrant requirement when responding to "a report of a *crime in progress*." *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) (emphasis added). In *Sutterfield,* officers were acting as caretakers - there was no available warrant option to the officers, as no crime was suspected. Police were acting solely "out of legitimate concern" for "safety and well-being (in other words, **there is no hint that they were using the emergency** as pretext to look for evidence of a crime)." *Id.* at 564. (emphasis added.)

Defendants ignore that in *Caniglia v. Strom*, 593 U.S. 194, 141 S. Ct. 1596, 1600, 209 L. Ed. 2d 604 (2021),[6] the Supreme Court held that officers were constitutionally

[6] Defendants essentially ask this court to draft an opinion similar to the below, which is the exact opinion that was explicitly rejected by the Supreme Court in *Caniglia*:

> Viewed objectively, the facts available to the officers at the time of the seizure place this conclusion well within the realm of reason. The officers knew that the plaintiff had fetched a firearm during an argument and implored his wife to "shoot [him] now and get it over with." They also knew that his behavior had so

forbidden from shirking the warrant requirement under the Fourth Amendment in service of mitigating or avoiding any risk of posed by a potentially suicidal or otherwise dangerous man with access to guns. *Caniglia v. Strom*, 593 U.S. 194, at 199. Instead, Defendants cite a 20-year-old unreported district court decision, *Holzman v. City of S. Bend*, No. 3:05-CV-316RM, 2006 WL 2788587, at *3 (N.D. Ind. Sept. 25, 2006), that granted officers qualified immunity for intruding on Mr. Holzman's home to protect him from suicide. (Dkt. 30, p. 8.) But again – in that case there was no hint of the officers acting for a criminal enforcement purpose. *Id.* Rather, the officers had a reasonable belief that Mr. Holzman was suicidal and that there was a need to act to protect his safety, not arrest him for a misdemeanor – and this is why the emergency

---

> dismayed his wife that she spent the night at a hotel and requested a wellness check on her husband the next morning because she feared that he might have committed suicide. No rational finder of fact could determine that an officer confronted with this scenario would be acting unreasonably by refusing to shut his eyes to the plaintiff's obvious risk of self-harm. [contd.]
>
> …
>
> Faced with the unenviable choice between sending the plaintiff to the hospital and leaving him (agitated, ostensibly suicidal, and with two handguns at his fingertips), the officers reasonably chose to be proactive and to take preventive action… Even if the plaintiff intended only a hyperbolic flourish, we cannot say that it was outside the realm of reason for the officers to discern a serious risk of imminent self-harm, given the surrounding factual context: a man had recklessly thrown a firearm, made a desperate exclamation suggesting (at best) a fraught frame of mind or (at worst) a propensity for self-harm, and so unnerved his wife that she hid the magazine for the gun from him, stayed overnight at a hotel, and worried whether her husband might have committed suicide the next morning. Standard police equipment does not include crystal balls. Here, we think it apparent that the officers were amply warranted on objective grounds in concluding that the flashing red lights signaled imminent danger.

*Caniglia v. Strom*, 953 F.3d 112, 127-28 (1st Cir. 2020), *vacated and remanded,* 593 U.S. 194, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021).

aid exception applied. *Id*. And, even then, it only applied up to the moment that officers knocked on the door and learned from Mr. Holzman that he was terminally ill and researching doctor-assisted suicide. *Id*. At that point, even though the *Holzman* court gave the officers qualified immunity for the initial unreasonable entry because they were conducting a "welfare check" for "the purpose of determining whether he was going to take his own life or the lives of others," that immunity did not carry over to the officers' use of force to effectuate entry or their failure to intervene to stop each other from using force. *Id*. at *4-5.

In sum, Defendants cannot rely on the emergency aid doctrine to authorize circumvention of the warrant requirement when they are conducting a criminal law enforcement operation – the Deputies were not there to commit Dylan under Chapter 51 or make sure that he wasn't bleeding out; they were there to arrest Dylan for disorderly conduct toward his uncle, a politician in the same area as the Sheriff. Defendants admit they did not come upon any emergency in progress but rather "a calm encounter." (Dkt. 30, p. 1.)

## VI. The existence of probable cause does not entitle Defendants to qualified immunity, because the case law is clear that even with probable cause, a warrantless at-home arrest is unreasonable.

Defendants argue that the text/social media messages Dylan had sent to his cousin gave them probable cause to arrest him for disorderly conduct, and that a reasonable officer would think this amounted to "exigent circumstances," or that the existence of probable cause somehow entitles deputies to qualified immunity for failing

to obtain a warrant. (Dkt. 30, pp. 6-7.) Relatedly, and even more far-fetched, Defendants argue that the *previous threat* Dylan's Uncle reported, for which Dylan had already been arrested, charged with disorderly conduct, and for which he had appeared in court that very day, constituted an "exigent circumstance." (Dkt. 30, pp. 6-7.) These arguments are patently incompatible with the case law as discussed above. *See Hawkins v. Mitchell*, 756 F.3d 983, 992 (7th Cir. 2014), *citing Welsh,* 466 U.S. at 750, 752–54, 104 S.Ct. 2091, and *Reardon v. Wroan,* 811 F.2d 1025, 1028 (7th Cir. 1987) (per curiam). Because the core of the Fourth Amendment's protection is the right to retreat to one's home and there be free from government intrusion, a warrant is required for an at-home arrest, "at least in the absence of exigent circumstances, **even when** it is accomplished under statutory authority and when **probable cause is clearly present**." *Payton v. New York*, 445 U.S. 573, 589, 100 S. Ct. 1371, 1381, 63 L. Ed. 2d 639 (1980) (emphasis added), *quoting United States v. Reed*, 572 F.2d 412, 423 (1978), cert. denied, *sub nom. Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259.

Next, Defendants meekly argue that concerns for Dylan's mental health and well-being warrant affording them qualified immunity. (Dkt. 30, p. 21.) Defendants argue they should be afforded qualified immunity because it was not clearly established that officers could not go to his house with the purpose to "coax him out of his residence and away from his guns." First, Defendants cannot successfully make this argument in the face of *Caniglia v. Strom*, 593 U.S. 194, at 199, where the Court held the exact opposite. Second, as per above, it is obvious that Defendants were acting in their criminal enforcement capacity and *not* in a community caretaker capacity. (PAPFOF 20-

28.) Third and perhaps most poignantly, the evidence establishes that not only would a reasonable officer know this alleged coercive community caretaking function was illegal – they stayed in the Hancock's yard long after their efforts to coax him out of his residence so they could arrest him had ground to a halt - but *these officers knew they were acting in a manner that would be illegal without a judge's authorization.* Deputy Sedani can be heard on body camera explaining to Mr. Wolff that a judge could order that the guns be removed after a hearing, but Sedani did not have the power to simply go into Dylan's house and remove any guns without a judge ordering it. (PAPFOF 19.) Therefore, they do not qualify for immunity when they did it anyway. The "defense of qualified immunity [] is not available to…those 'who knowingly violate the law.'" *Thompson v. Wagner*, 319 F.3d 931, 935 (7th Cir. 2003), *as amended on denial of reh'g* (Mar. 14, 2003), quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Bottom line, qualified immunity does not help defendants because even qualified immunity does not change the rule that facts must be construed in favor of the nonmoving party on a motion for summary judgment. *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005).

## VII. Dylan's privileged refusal to consent to an at-home warrantless arrest cannot constitute an exigency nor can it be considered active resistance to arrest.

Defendants imply, throughout, both with respect to their exigency argument and their deadly force argument, that it was Dylan's responsibility to consent to an at-home

warrantless misdemeanor arrest, rather than *their* responsibility to either get a warrant, or otherwise face the constitutional fact that if Dylan refuses to voluntarily come out for an arrest, they must leave. For example, Defendants argue that "Hancock was given ample opportunity to comply with the officers' commands and attempt to deescalate the situation despite his continued resistance and refusal to turn over his weapons to officers." (Dkt. 30, p. 23.) As shown above, they knew that Dylan did not have to come out to be arrested and they knew that he did not have to turn over his guns on their say-so.

Similarly, the Defendants argue that deadly force was permitted because Dylan was actively resisting arrest. (Dkt. 30, p. 11-12, p. 24.) Defendants quote some cases but ignore that law they are quoting always requires an officer to have lawful authority to give an order or make an arrest, before the onus would ever fall on a citizen to obey him. For example, Defendants cite *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009), for the principle that "An officer **who has the right to arrest an individual** also has the right to use some degree of physical force or threat of force to effectuate the arrest . . . ." (Dkt. 30, p. 11, emphasis added.) And, Defendants cite *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020), for the principal that, "Law enforcement officers may use 'significant force to subdue someone who is actively resisting **lawful** detention.'" (Dkt. 30, p. 12, emphasis added.)

But Defendants also admit that the arrest in this case was an at-home warrantless arrest and therefore could be found "per se unreasonable," i.e. per se unlawful. (Dkt. 30, p. 5.) Dylan's refusal to consent to the police presence outside his bedroom window is

not only not an exigency, but it is his constitutionally protected right. *Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 691 (7th Cir. 2001) ("When time permits, officers who elect not to obtain a warrant unnecessarily risk the type of constitutional violation involved in this case.")

A person is within their rights to refuse to submit to unlawful police conduct. *See e.g. Welsh v. Wisconsin*, 466 U.S. 740, 744, 104 S. Ct. 2091, 2100, 80 L. Ed. 2d 732 (1984) (arrestee's refusal to submit to a breath test after an intoxicated-driving arrest is *reasonable* when the underlying arrest was not lawful, such that arrestee could not be prosecuted for refusal.) There is a well-established federal common-law right to resist unlawful arrests and other unlawful invasions of private rights. *People v. Trapp*, 335 Mich. App. 141, 163-64, 966 N.W.2d 420 (2020); *United States v. Di Re*, 332 U.S. 581, 594, 68 S. Ct. 222, 228, 92 L.Ed. 210 (1948) ("One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases."); *Hardy v. City of Milwaukee*, No. 13cv769-JPS, 2014 WL 2542756, at *11 (E.D. Wis. June 13, 2014) (same); *Fillyaw v. Tenhaken*, No. 20cv827, 2022 WL 95175, at *5 (E.D. Wis. Mar. 30, 2022) ("A factfinder could reasonably conclude that…[the officers'] detainment of Fillyaw was unlawful, and Fillyaw had a right to resist them.") This means both that Dylan's refusal to consent cannot be equated to an exigency allowing Defendants to arrest him without a warrant, nor can it be equated to unlawful active resistance that would provide license for a reasonable use of deadly force.

## VIII. A dispute of fact as to whether Dylan pointed a weapon at Deputy Weigand prohibits summary judgment and defeats qualified immunity on the claim of excessive deadly force.

"It is well-established – and has been since long before the shooting at issue here - that 'a person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force.'" *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 484 (7th Cir. 2015) (citations omitted). If a "suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985). That said, "someone does not pose an immediate threat of serious harm solely because he is armed," because "[h]aving a weapon is not the same as threatening to *use* a weapon." *G.J. v. Wood Cnty.*, No. 20-CV-108-WMC, 2021 WL 2593458, at *7 (W.D. Wis. June 23, 2021), *citing Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020), and *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015) (emphasis added by Judge Conley.)

Plaintiff and Defendants agree that the "nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight.'[7] *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). [And that if] a suspect threatens the officer with a weapon, deadly force may be used." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018)." (Dkt. 30, p. 10.) But as Defendants also know, Deputy Weigand's allegation that Dylan threatened him with a weapon by pointing a gun out the bedroom window at the time of the shooting *is disputed*. (DPFOF 126-131; PAPFOF; 71, 77-79, 83.) And, "immediately shooting a suicidal person who is neither resisting [lawful] arrest nor threatening anyone save himself is an excessive use of force." *Weinmann v. McClone*, 787 F.3d 444, 451 (7th Cir. 2015).

Just as in *Weinmann*, before this Court is a case where the deputy insists he "perceived the weapon as being pointed in his direction," but the plaintiff denied pointing his gun at the deputy. *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015). Therefore, a jury must decide the facts. *Id.* When the deputy claims the Plaintiff "had the gun raised to his shoulder and pointed it at" him, he is "justified in using deadly force and hence entitled to qualified immunity" *only if* there are no facts to dispute the deputy's contention. *Id.* at 449-450.

---

[7] Defendants also argue that the *Graham* "calculus is ultimately the same whether the target of the officer's lethal force is an individual resisting arrest or an individual suffering from a mental health crisis." (Dkt. 30, p. 14.) This is necessarily untrue – because two of the three factors automatically side with a mentally ill person – though undisputedly the imminent threat could occur from any source and if reasonably perceived, would warrant deadly force. Under *Graham*, 490 U.S. at 397, 109 S.Ct. 1865, and *Garner* 471 U.S. 1, 9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), courts are instructed to balance the government's interest in the seizure against the citizen's interests, and on that scale, the "intrusiveness of a seizure by means of deadly force is unmatched," as it is intended and likely to deprive the citizen of his fundamental interest in life. *Longoria v. Pinal Cnty.*, 873 F.3d 699, 705 (9th Cir. 2017). On balance, the government's competing interest is lessened when the citizen's actions are known to be caused by mental illness, though not minimizing that the most important factor is whether there was an imminent threat at the time deadly force is used. *Id.*

Moreover, even if Weigand had successfully killed Dylan such that he was not here to dispute the claim that he pointed a gun, the jury could still disbelieve Weigand. First, Weigand is lying about giving a warning prior to shooting – so the jury could find him lying about other things. (DPFOF 133-134; PAPFOF 74.)[8] Second, there is evidence that Weigand did not actually see what he was shooting at because when other trained law enforcement personnel stood in that same spot, they could not see into the bedroom clearly enough to see if Dylan was holding a gun (PAPFOF 64, 73). Weigand's utter incredibility is buttressed by the fact that Weigand continued to say that he could see Dylan in the window after he shot Dylan, when it would have been impossible because Dylan was an immobile puddle on the floor. (*See* Plaintiff's response to DPFOF 138.) The flip side of that coin is that he could not see Dylan when he shot – or he would have seen him drop.

Third, Dylan was nowhere near the window when he was shot, as evidenced by the scene photos showing where he dropped, and his father's report to the deputies moments before the shooting that Dylan was braced against the bedroom door to stop people from entering, a report that was consistent with the scene photos and body cam footage. (PAPFOF 77-79.)

---

[8] *Pryor v. Seyfarth Shaw, Fairweather & Geraldson*, 212 F.3d 976, 979 (7th Cir. 2000)("Disbelieving a witness's testimony about one of the material facts in a case can justify the trier of fact in disbelieving the witness's contested testimony on other material facts.")




(PAPFOF 79.)

Fourth, in the aftermath of the shooting, while body cameras were still rolling, Deputy Weigand said he could have provided time and space for Dylan to calm down, except for the fact that Dylan's dad, Mr. Brad Hancock, was in the house. (PAPFOF 81.) At the time, Mr. Hancock had just gone into the house because Deputy Sedani told him to go get Dylan's guns away from him. (DPFOF 106, PAPFOF 68.) Thus, shooting Dylan to save his father cannot be even arguably reasonable, and it counters Weigand's claim now that he had to shoot because *he* was in imminent danger.

Defendants' arguments requesting qualified immunity mirror those rejected by this court in *G.J. v. Wood Cnty.*, No. 20-CV-108-WMC, 2021 WL 2593458, at *8 (W.D. Wis. June 23, 2021). Defendants cite *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1012 (7th Cir. 2006), *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007), and *Horton v. Pobjecky*, 833 F.3d 941, 950 (7th Cir. 2018), for the proposition that Deputy Wiegand is entitled to qualified immunity "even assuming a genuine factual dispute exists as to whether Plaintiff pointed a firearm at Deputy Weigand," claiming that officers can reasonably shoot a person for possessing a weapon, even if he does not yet have control of the weapon. (Dkt. 30, pp. 24-25.) Cases like *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015) would inform any reasonable officer that this is clearly not the law. For starters, in *DeLuna*, *Henning, and Horton* there was no complaint that the officers were conducting unlawful arrests or issuing unlawful orders.

In *DeLuna*, an officer was dispatched for a domestic violence call involving a known violent man, who was disregarding the officer's lawful orders to stop and put his hands up. *Id*. at 1012. The officer back-peddled some 50 feet, but stumbled backwards – and at that moment "DeLuna lunged toward him" and DeLuna was close enough to reach the officer's weapon. *Id*. It was in this context that the court said an officer, "need not wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious physical injury." *Id*. at 1013. Absent decisive force on the officer's part, that struggle was inevitably a split second away.

Similarly, in *Henning*, the plaintiff resisted a lawful arrest with physical force, fighting with the officer, and reaching for the trigger of the officer's gun that had fallen

out if its holster. *Id*. at 496. It was against this backdrop that the Seventh Circuit said that officers cannot be expected to wait for the suspect to have a firm grip on the officer's weapon "before taking action to ensure their safety." *Id*.

This case is nothing like *Henning* and *DeLuna* as Dylan had no known history of physical violence, was not ignoring *lawful* orders, and was not approaching the officers or fighting with them. Rather, Dylan was locked in his own bedroom where an officer from a distance shot him through the wall of his home without *any warning* and without even *speaking or interacting with Dylan at all* in the 14 minutes leading up to the shooting. (PAPFOF 66, 68, 84.)

*Horton v. Pobjecky*, 833 F.3d 941 (7th Cir. 2018) was a crime-in-progress case where the off-duty officer at a pizza parlor had only 45 seconds to react to four assailants attempting to commit an armed robbery and there was a struggle over a loaded gun, such that deadly force was warranted under a rationale that could never apply to the case at bar – these were men, who outnumbered the officer, committing "a felony involving the threat of deadly force, armed with a deadly weapon, and likely to pose a danger of serious harm to others if not immediately apprehended." *Horton v. Pobjecky*, 883 F.3d 941, 950–51 (7th Cir. 2018). Dylan was suspected only of a misdemeanor and was refusing to leave his home.

Defendants argue then, that even if Hancock did not point a gun at Weigand, Weigand was privileged to shoot Dylan inside his home because (a) "Hancock was suspected of disorderly conduct and going armed with a firearm while under the influence of an intoxicant," (b) Hancock was "armed with a gun," and had "access to

two firearms in his bedroom" (c) Hancock had earlier picked up the gun in front of Welker and then set it down on Welker's order, (d) Hancock had made a threat to commit "suicide by cop," and (e) Hancock had three minutes earlier completed a countdown, saying he would shoot himself if deputies didn't leave. (Dkt. 30, p. 24, Plaintiff's response to DPFOF 123.) However, Defendants cite no law in support of their notion that these factors warrant the reasonable use of deadly force to stop a non-imminent potential threat. *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701, 85 L. Ed. 2d 1 (1985); *G.J. v. Wood Cnty.*, No. 20-CV-108-WMC, 2021 WL 2593458, at *7 (W.D. Wis. June 23, 2021).

Defendants suggest that *Fitzgerald v. Santoro*, 707 F.3d 725, 732–33 (7th Cir. 2013) gave them authorization to seize Dylan with deadly force because he was suicidal and had a gun, in order to prevent Dylan from injuring himself or others. (Dkt. 30, pp. 12.) This is not accurate. First, it is actually statutorily illegal to use deadly force to prevent a person from committing suicide. Wis. Stat. § 939.48(5). Second, Defendants misapply *Fitzgerald* because of their conflation between community caretaker functions and law enforcement functions. *Fitzgerald* was a caretaking case, not "a standard arrest case because Fitzgerald was not a criminal suspect, and she was not subject to arrest, but rather to civil seizure for self-protection" pursuant to an Illinois commitment statute authorizing the same, 405 ILCS 5/3–606. *Id*. at 734. Against that backdrop, the officers' conduct in carrying out a warrantless entry and applying "*minimally forceful* techniques designed to subdue non-compliant subjects and *prevent escalation*…" was reasonable, and "they did not attempt to completely disable her." *Id.* (emphasis added.)

Defendants here forced Dylan to suffer the indignities of an unconstitutional arrest while knowing that he was suffering from a mental illness episode – and the Defendants *encouraged escalation* and used *the deadliest force in their arsenal.*

In even making such an argument, the Defendants create disputed issues of fact among themselves – claiming on one hand that this was just a simple misdemeanor investigation that began as a calm encounter through Dylan's window where they just wanted to knock on his front door and question him and he surprisingly escalated the situation, and positing on the other hand that this was a community caretaking effort to swiftly act to make sure Dylan did not commit suicide because they knew he was in crisis, and sometimes suggesting on a third hand that Dylan was a violent danger to the world at large and had to be immediately apprehended. A factfinder has to determine the "specific situation [Deputy Weigand] encountered, and events leading up to the decision to use deadly force." *Est. of Robinson ex rel. Irwin v. City of Madison, Wisconsin*, No. 15-CV-502-JDP, 2017 WL 564682, at *18–19 (W.D. Wis. Feb. 13, 2017), *dismissed sub nom. Est. of Robinson ex rel. Irwin v. Kenny*, No. 17-1342, 2017 WL 11814837 (7th Cir. Mar. 2, 2017) (denying summary judgment to an officer who used deadly force during a welfare check when he entered without waiting for back up to arrive.)

Moreover, this was not a time when "split-second judgments" were necessary. The plan was to create a perimeter around the home and wait for the well-trained SWAT/ERT team to arrive – with their special training and tools. This is what *every other deputy on scene was doing*, and Weigand provides no reasonable excuse for not doing the same thing. (*See* DPFOF 89, 91.) The "short period of time that elapsed from

[Anthony Weigand's] arrival to the confrontation, and his abrupt action," gives context to [Dylan's] possession of the [gun in his bedroom] that might be different if [Dylan] had himself come to the door" holding it. The circumstances known by [Deputy Weigand], or even created by him, inform the determination as to whether the lethal response was an objectively reasonable one. *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 483 (7th Cir. 2015); *see also Barnes v. Felix,* 145 S. Ct. 1353, 1354, 221 L. Ed. 2d 751 (2025) (earlier "events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous.") Hence, a jury could reasonably find that when Deputy Weigand saw Dylan with a gun, he knew Dylan did not have any intent to hurt others, but only to hurt himself, making it less reasonable to immediately resort to deadly force without the gun being pointed. The fact that Weigand put himself in a position where he could *feel* an imminent threat, despite being informed that Dylan was thinking about pretending to threaten an officer to induce an officer to shoot him, makes the force less reasonable. *See e.g. Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010–11 (E.D. Wis. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015) ("a reasonable officer would have known that there is a high likelihood that a suicidal person will respond to an officer's show of force with an action that is likely to provoke the officer to use deadly force, as the person may wish to commit 'suicide by cop.'…In light of these risks, Blanchard needed to have a compelling reason to enter Brown's bedroom with his gun drawn.").

It is unreasonable that Weigand "resorted to the use of lethal force as an initial matter," despite the plan in place that the deputies would wait for the SWAT/ERT team to arrive with less lethal options. *Williams* at 484. Weigand actually arrived to the scene and suddenly fired two bullets into the house, despite that *not one deputy had interacted with or spoken to Dylan in almost 15 minutes.* (PAPFOF 66.) Deputies "responding to a scene in which a suicidal person is locked in a room are faced with the difficult determination as to whether delay in responding will allow the person to further harm himself or to become aggressive toward others. It is clearly established, however, that officers cannot resort as an initial matter to lethal force on a person who is merely passively resisting and has not presented any threat of harm to others." *Id*. at 485.

Defendants argue that *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018), says it is irrelevant whether Deputy Weigand could have taken cover or simply waited for ERT/SWAT as all the other deputies on scene were doing. (Dkt. 30, p. 13.) But in *Sanzone*, the plaintiff was *actually pointing a gun* at the officer – so the officer did not have to explore alternatives before defending himself with his service revolver. *Id.* What the Seventh Circuit said was that "*Graham* makes it clear that the Fourth Amendment does not require the use of alternatives before deadly force in a situation such as this **when there is "no time."** *See Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003); *Plakas*, 19 F.3d at 1149." *Sanzone v. Gray,* 884 F.3d 736, 740 (7th Cir. 2018) (emphasis added.)

The fact that the deputies knew that Dylan's father was inside trying to comfort his son, and that Deputy Sedani had just moments prior told Dylan's father to go back

into the house to get Dylan's gun, (DPFOF 106) makes the shooting that much more unreasonable. *See Williams v. Indiana State Police Dep't*, 797 F.3d 468, 484 (7th Cir. 2015) (one fact countering officer's description of the plaintiff as an imminent threat to others was the fact that the plaintiff's parent was able to enter the room and talk with him.) And, that is not even to mention the risk to Dylan's father's life that Deputy Weigand was recklessly willing to take when he fired into the Hancock home.

Deputy Weigand's failure to give Dylan a warning prior to shooting makes the use of deadly force all that much more unreasonable. (PAPFOF 74, 84.) *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (deadly force may be used when there is "probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, ***warns the suspect before firing*.**" (emphasis added.)) Deputy Weigand argues he is entitled to qualified immunity in large part because he gave Hancock a warning and a chance to drop his gun, and Hancock disregarded it and instead kept pointing it, which made Deputy Weigand think that Dylan had the intent to shoot somebody. (Dkt. 30, p. 23.) But the body camera does not lie, and it shows that that Deputy Weigand gave Dylan *no chance* to drop the gun to avoid being shot, rather Deputy Weigand virtually simultaneously yelled drop the gun (from so far away that Dylan, inside his bedroom, was unlikely to have heard the warning) and fired two shots. (PAPFOF 74, 84.) This is particularly unreasonable because Dylan had a constitutional right to be in his own home with his lawfully owned gun, and despite this, Dylan nonetheless had acquiesced to unlawful commands and

had earlier set down his gun and raised his hands when interacting with the deputies, to avoid, upon warning, getting shot. (PAPFOF 52-55.)

**IX. A jury could reasonably award punitive damages.**

Defendants argue that there is "nothing in any of the deputies' body camera footage or declarations [that] comes close to resembling a reckless or callous mindset or attitude toward Hancock, let alone evil motive. (Dkt. 30, p. 36.) It is this Court's "typical practice" to deny the requested relief on summary judgement, rather waiting until trial to determine if punitive damages should appropriately go to the jury, "once the court has had the benefit of reviewing all the evidence submitted by plaintiff during the liability phase." *J. v. Wood Cnty.*, No. 20-CV-108-WMC, 2021 WL 2593458, at *10 (W.D. Wis. June 23, 2021).

The "deterrence of future egregious conduct is a primary purpose of both § 1983…and of punitive damages." *Smith v. Wade*, 461 U.S. 30, 49. 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury, which may or may not make such an award." *Id.* at 52. (citation omitted.) Whether a defendant's "conduct met the recklessness threshold" is "a question of ultimate fact" for the jury, and whether that conduct merits a punitive award in addition to compensatory award is "a discretionary moral judgment" by the jury. *Id.* "Punitive damages are awarded in the jury's discretion 'to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future.'" *Id.* at 54. (citation omitted.)

The Seventh Circuit's Standard Civil Punitive Damages Instruction 7.28 provides that a jury "may assess punitive damages only if you find that [the deputies'] conduct was malicious or in reckless disregard of Plaintiff's rights…Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, Defendant simply did not care about Plaintiff's safety or his rights." *See also Smith v. Wade*, 461 U.S. 30, 48-51, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983) (punitive damages may be awarded "not only for actual intent to injure or evil motive, but also for recklessness, serious indifference to or disregard for the rights of others…reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages.")

Punitive damages are appropriately considered when there is "evidence from which a jury might infer that [the Defendant] in fact knew, or, circumstanced as he was, should certainly have known, that he was violating [the Plaintiff's] federal constitutional rights...[or at least] violating some legal duty of protection toward [the Plaintiff]." *Soderbeck v. Burnett Cty., Wis.*, 752 F.2d 285, 291-92 (7th Cir. 1985) (clarifying that "once the defendant is shown to have engaged in plainly unlawful conduct, to require a showing that the defendant knew which sovereign's laws he was violating would simply reduce the deterrent effect of punishment by making it harder to prove a violation."); *Hardy v. City of Milwaukee*, 88 F Supp. 3d 852, 860 (E.D. Wis. 2015) (punitive damages are very appropriate when a jury could believe the officer intentionally disregarded a known constitutional standard); see also *Betker v. City of Milwaukee*, 22 F. Supp. 3d 915, 929 (E.D. Wis. 2014) ("Although there was no evidence of ill will or

malice, the jury obviously concluded that defendant acted in reckless disregard of plaintiff's rights, and that a substantial punitive damages award was needed to punish and deter defendant. Under the circumstances, this conclusion was reasonable. There was a basis in the evidence for the jury to conclude that defendant made serious misrepresentations in his affidavit for a no knock warrant.")

And, if the jury believes that Deputy Weigand is lying, this would also be strong support for punitive damages. *See e.g. Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1016 (7th Cir. 2006), where "the officers themselves realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing Scott's arrest." In fact, because body camera shows Weigand is clearly misrepresenting that he gave Hancock a warning and chance to "drop the gun" prior to shooting, the jury could disbelieve everything he says. Or, the jury could find that punitive damages are warranted because Weigand was reckless with Dylan's life by *not* giving him a warning, particularly because earlier in the interaction when he was handling a gun, Dylan complied with instructions to set it down in order to avoid being shot. Or, the jury could find it particularly reckless to tell Mr. Hancock to go inside and remove Dylan's gun from his person, and then seconds later shoot into the bedroom because – Dylan was holding a gun. And, the fact that these Defendants knew it was "per se" unreasonable to go to Dylan's home and arrest him there <u>without</u> a warrant, and did it anyway, knowing the indignities of arrest would likely upset him and push him to suicide-by-cop behavior, shows recklessness in the first place. The Court should follow its usual procedure and leave its determinations on punitive damages until trial.

## X. A jury could find for Plaintiff on Title II ADA violations.

Plaintiff agrees with Defendants' recitation of Title II ADA law. However, Plaintiff disagrees that his "ADA claims fail for three reasons." (Dkt. 30, p. 33.)

Defendants' first and second argument is that Plaintiff was not a "qualified individual with a disability," because he was "drinking, suffering from a mental illness, or both." (Dkt. 30, p. 33.) Drinking is irrelevant. "Qualified individual with a disability" melds two questions into one phrase – the first is, was Plaintiff qualified for police services up to and including a reasonable arrest, the second is does Plaintiff have a disability as defined under the ADA. *See McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024) (quoting 42 U.S.C. § 12132) (to survive summary judgment Plaintiff is required to show "(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability." *McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024).)

<u>Qualified Individual:</u> Plaintiff agrees with Defendants that the definition of a qualified individual with a disability is a person who is eligible for services, programs, or activities by a public agency. (Dkt. 30, p. 33, citing 42 U.S.C. § 12131(2).) If Defendants are suggesting that Plaintiff was not qualified for police services, including a reasonable arrest, they provide no support for this argument. The ADA applies not only to voluntary participation, but also involuntary participation – such as inmates held in a public institution against their will. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211, 118 S. Ct. 1952, 1955, 141 L. Ed. 2d 215 (1998). Hence, law enforcement

services are fall squarely under the ADA. *Gorman v. Bartch*, 152 F.3d 907, 911–14 (8th Cir. 1998) (applying *Yeskey*.)

To be fair, some courts have declined to apply the requirement to abide by Title II to *some* law enforcement activities – during on-the-street encounters, i.e., unplanned responses and spur-of-the-moment arrests. The Fifth Circuit has held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents…prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards,* 207 F.3d 795, 801 (5th Cir. 2000). However, other circuits hold that "exigent circumstances attendant to a police officer's decisions during an *ad hoc* encounter simply weigh in the balance when evaluating the reasonableness of a prospective ADA accommodation." *Gray v. Cummings*, 917 F.3d 1, 16 (1st Cir. 2019) (collecting cases.) The Seventh Circuit has recently relied on *Gray*, assuming without deciding that Title II applies to officers' interaction in an unplanned response to a 911 call, and that a county can be vicariously liable under Title II for the "deliberate indifference" of its officers under a but-for standard. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 988-89 (7th Cir. 2020) (collecting cases). Regardless, in the case at bar, this was not an on-the-street encounter or even an urgent response to a 911 call. In the case at bar there is a planned arrest response (PAPFOF 24), so that principle has little application to this case.

<u>With a Disability</u>: It seems that what Defendants are really arguing is that Plaintiff was not disabled. Once again, Plaintiff agrees with Defendants that disability is defined as "(A) a physical or mental impairment that substantially limits one or more

of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 2102(1)." (Dkt. 30, p. 34.) *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019), *citing* 42 U.S.C. § 12102(1). On the day he was shot, Dylan fit all three definitions.

(A) Dylan had a mental impairment that substantially limited one or more major life activities. "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102(2)(a). Dylan had a long history of PTSD and depression, that interfered with his ability to concentrate, think, communicate, sleep, work, and regulate his emotions. (PAPFOF 86-87.) Specifically, Defendants argue that the nature and severity, expected duration, and long-term impact of Dylan's mental illness is not severe enough to qualify as a disability. But the bar for qualification for ADA protections is not so high. "Intermittent, episodic impairments are not disabilities, the standard example being a broken leg…But an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate. Often the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying impairment." *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir. 1995). The U.S. Equal Employment Opportunity Commission has provided recent guidance that: "A medical condition does not need to be long-term, permanent, or

severe to be substantially limiting. Also, if symptoms come and go, what matters is how limiting the symptoms are when they are active." https://www.eeoc.gov/disability-discrimination-and-employment-decisions#:~:text=Is%20subject%20to%20an%20adverse,benefits%20and%20privileges%20of%20employment (last accessed August 10, 2025). It is plainly obvious as evidenced here, that while Dylan can sometimes function well, when he has a mental health episode, his ability to reason, think, communicate, plan, and self-regulate are severely diminished, just as Deputy Sedani explained. (PAPFOF 20.)

(B) Dylan had a record of impairment. Defendants argue that there is no evidence that Barron County had prior knowledge that Dylan was "a qualified individual with a disability." (Dkt. 30, p. 33.) This is false. In their own records, Barron County documents at least two prior interactions with Dylan, where it was clear, and was reported by multiple family members, that Dylan had grown paranoid, dysregulated, and depressed/suicidal, and struggling with mental illness, as far back as 2018. (PAPFOF 1-14.)

(C) The Defendants regarded Dylan as mentally ill. In *Ravenna* v. *Vill. of Skokie*, 388 F. Supp. 3d 999, 1008 (N.D. Ill. 2019), the court found "evidence that due to its extensive experience with Ravenna's repeated complaints, the Skokie Police Department considered Ravenna to have a mental illness," satisfying the proof of disability, because "Title II protects people who are 'regarded as having an impairment.'" *Id*. at 1008, citing 42 U.S.C. § 12132(1)(C).) Like the case at bar – the officers in that case specifically discussed the perceived mental illness. (PAPFOF 20-21,

DPFOF 4, 25-26.) *Id*. at 1009 ("The Commander reported directly to the Police Chief noting that the incident was 'another' product of Ravenna's 'delusions.'") Here, the Sheriff directly reported to his deputies that they should check the record from Dylan's prior incident a few months earlier – which revealed mental health issues (DPFOF 13, PAPFOF 7-14) – and that he was presently a suicide-by-cop risk (DPFOF 11). When Deputy Sedani went to interview Dylan's uncle and cousin, the family explained that Dylan was suffering mental illness and suicidal thoughts. (DPFOF 4, 11; PAPFOF 21.) Deputy Sedani states on body camera that he was aware of mentally ill people like Dylan, who can do well for a while but then have manic episodes like this when they go off their medicine, etc. (PAPFOF 20.) There can be no question that Defendants perceived Dylan to be mentally ill – and in fact they admit they recognized that they were dealing with Dylan "during what may have been a mental health crisis." (Dkt. 30, p. 8.)

Therefore, Dylan is a qualified person with a disability under Title II of the AD, qualified because "with or without reasonable modifications to the rules…[he] meets the essential eligibility requirements for the…participation in programs or activities provided by a public entity." *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 849 (7th Cir. 1999), *citing* 42 U.S.C. § 12131(2).

The Defendants' third argument is that Dylan was not "denied access to government services, i.e. shot, because of his disability." (Dkt. 30, p. 34.) In other words, they suggest Plaintiff cannot meet the but-for standard of causation, but the fallacy in this argument is its focus on the moment of the shooting. (Dkt. 30, p. 35.)

Defendants cite *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, where the court found that "the mental illness of WCS's patients is not the cause-if-fact of WCS' inability to obtain a suitable facility." 465 F.3d 737, 754 (7th Cir. 2006). Rather, the program made decisions based on raising the most tax revenue, and was therefore rejecting non-profits across the board, regardless of the disability status of the applicant mental health clinic's patients. *Id.*

More to the point Defendants cite *King v. Hendricks County Commissioners*, 954 F.3d 981, 989 (7th Cir. 2020). There, the court found no ADA discrimination because the officer would have made the same decision – to shoot a person running at him with a knife – regardless of any disability, and "King did not propose anything that [the officer] should have done differently to accommodate Bradley's mental illness." *Id.* In that case, "police responded promptly to Bradley's call for assistance" and upon doing so, "Bradley ran at him with a knife." *Id.* There was "no reason to believe that [the officer's] response would have been different had someone not suffering from a mental illness done the same thing" and there was nothing that the officer "should have done differently to accommodate Bradley's mental illness." *Id.* at 989. The Seventh Circuit said, "if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled." *Id.* In sum, there was no evidence that the "County was deliberately indifferent to the needs of community members suffering from mental illness and failed adequately to train officers in how to handle such persons…[or] that but for alleged [disability] discrimination" the decedent would not have been shot. *Id.*

But here, in the words of *King,* a jury could find the deputies *did* make decisions based on Dylan's mental illness that would have been made differently for a non-disabled person, there *were* things that Defendants should have done differently, there *is* evidence Plaintiff was denied medical care at a point when there was no eruption of violence, and there *is* evidence that the County was deliberately indifferent to the needs of community members suffering from mental illness.

First, as Deputy Sedani explained on body cam, he knew that a citizen had the right to not be separated from his lawfully owned firearms, on a family member's report of mental illness, without a court order to that effect. (PAPFOF 19.) Yet, according to Defendants, after consultation with co-workers, this is what the deputies decided to do - "coax him out of his residence and away from his guns." (Dkt. 30, p. 21.) A jury could find that this evinces a deliberate choice to treat Dylan's rights as expendable solely because of his mental illness. *See Wis. Cmty. Servs., Inc. v. City of Milwaukee,* 465 F.3d 32 737, 753 (7th Cir. 2006) (ADA discrimination is shown if "defendants intentionally acted on the basis of the disability.") Treating someone as if they have fewer rights simply because of their condition is as straightforward as discrimination can get.

Second, there were things that Defendants should have done differently. ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018), *citing Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). "Unlike Title I [employment] and

Title III [lodging/transportation/restaurants], Title II of the ADA does not contain a specific accommodation requirement." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751-52 (7th Cir. 2006). Instead, Title II requires that a "public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* at 752, *citing* 28 C.F.R. § 35.130(b)(7). The "regulation clearly contemplates that prophylactic steps must be taken to avoid discrimination." *Id.* at 753.

However, case law has emerged that, "failure to accommodate is an independent basis for liability under the ADA," and under Title II, a reasonable accommodation is required when necessary to avoid discrimination. *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d at 752. "Reasonable" means efficacious and proportional to the cost of implementation, but a modification to policy would be unreasonable if "it is so at odds with the purpose behind the rule that it would be a fundamental and unreasonable change." *Id.* Whether an accommodation is reasonable is highly factually specific and takes into account "*all* of the costs to *both* parties." *Id.* (emphasis in original.)

And, the "reasonable accommodation requirement usually does not apply unless triggered by a request," because a person's disability and needs are not always known absent a request. *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1087 (C.D. Ill. 2010); *see also Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006). Whether a

requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties. *Lacy v. Cook Cnty., Illinois*, 897 F.3d at 865.

The case at bar presents both. There was opportunity to plan, and for the Sheriff and/or his deputies to make accommodations. This is the "accommodation" theory under the ADA when police "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Gray v. Cummings*, 917 F.3d at 15-16 (plaintiff's accommodation theory was that officers should have accommodated her disability by employing time, patience, nonthreatening communication, monitoring from a distance, etc.). Defendants know that situations involving "an individual suffering from a mental health crisis can quickly morph into dangerous circumstances justifying the use of lethal force." (Dkt. 30, p. 14.) Yet, they make no excuse for taking no precautions, in the form of applying what they knew, to any sort of accommodation for Dylan.

For starters, since the deputies knew exactly what they were confronting and cannot pretend to have been blind-sided by it – if they were going to proceed with attempting to arrest Dylan right then, there was no reason not to have the ERT/SWAT unit conduct this arrest in the first place, because they, with their special weapons and tactics, have been able to handle all recent barricaded-subject satiations *without incident*. (PAPFOF 82.) It is not a reasonable plan to have deputies respond to Dylan's home for a warrantless misdemeanor arrest and refuse to respect his rights – acting as picadors

infuriating the bull – just so the matadors can later come in and finish the job…if the bull is still alive.

And, there was a specific request for an accommodation made. Dylan's uncle, upon calling the Sheriff, specifically requested that deputies be careful because of Dylan was a suicide-by-cop risk, and he repeated the same to Deputy Sedani. (DPFOF 4, 11, 26; PAPFOF 28.) In other words, a specific accommodation was being requested – and the officers deliberately disregarded it – instead responding in a way that would escalate the danger. It has long been known that a suicide-by-cop scenario should be avoided by officers not putting themselves in a position where they will fear for their safety, absent a compelling reason. *Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010–11 (E.D. Wis. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015).

There was also the opportunity to simply wait for things to cool down, at least when Dylan was seen safely in his bedroom in a decent mood, and politely asked the officers to leave. They could have followed up another time, or simply mailed Dylan a summons. *See Ravenna* v. *Vill. of Skokie*, 388 F. Supp. 3d 999, 1009 (N.D. Ill. 2019) (conducting a misdemeanor disorderly conduct arrest "exhibits deliberate indifference to Ravenna's disability. *This case likely would have been avoided if Skokie had issued a summons rather than subjecting her to the alleged violence and indignity of arrest*.") In context, if it weren't constitutionally required in the first place, Dylan's request that the officers leave can be seen as an explicit request for an accommodation.

Obviously (from the fact that it is what the rest of deputies on scene were doing) Weigand could simply have taken a position on the perimeter and waited for the ERT/SWAT unit to arrive, because they, with their special weapons and tactics, have been able to handle all recent barricaded subject satiations *without incident*. (PAPFOF 82.) And, the only reason Weigand said he could not do as the other deputies were doing was because Dylan's dad was in the house, despite that Sedani had just told Dylan's dad to go into the house. (DPFOF 106, PAPFOF 68, 81.)

Third, Wisconsin law counsels that suicidal people be afforded emergency medical services under Chapter 51 detention. "The purpose…is to provide, on an emergency basis, treatment by the least restrictive means appropriate to the ["mentally ill"] individual's needs," to deal with a "substantial probability of physical impairment or injury to himself...or other[s]." Wis. Stat. § 51.15. The decision to conduct a misdemeanor arrest of Dylan at home, without seeking a warrant, and with knowledge that he had a "house full of guns" and might attempt suicide by cop, is patently unreasonable, in light of the fact that Dylan could have been provided Chapter 51 services in consultation with mental health professionals. This stems from the officers failing to appreciate, despite specifically being informed, that Dylan's disorderly conduct toward family members was a product of his mental illness – this *should have* resulted in deputies taking steps toward a Chapter 51 detention – i.e., what *Gray* and *King* refer to as the "effects" theory. *See Gray v. Cummings*, 917 F.3d 1, 15-16 (1st Cir. 2019) ("effects" theory was asserted when arguing the officer misperceived her failure

to follow his commands as a crime rather than a symptom of her disability.)[9] The Defendants ironically request qualified immunity for their warrantless at-home arrest citing cases like *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014), explaining that it is at least arguably reasonable to conduct a warrantless arrest for a Chapter 51 detention, despite the fact that a major flaw in their response in this case was the *failure* to initiate a Chapter 51 action and instead doggedly pursue a misdemeanor arrest for actions which they knew were the product of family disputes and mental illness.

Fourth, there is evidence that the County was deliberately indifferent to the needs of community members suffering from mental illness. "It is well established that a failure to make 'reasonable modifications in policies, practices, or procedures' can constitute discrimination under Title II." *Lacy v. Cook Cnty., Illinois,* 897 F.3d 847, 853 (7th Cir. 2018). *McDaniel v. Syed*, 115 F.4th 805, 823 (7th Cir. 2024) (same). And, Barron County had none. Neither Sheriff Fitzgerald, with policymaking authority, nor any deputy, made any attempt to tailor their services to accommodate Dylan's mental impairment or illness. (PAPFOF 30.) Barron County has provided no training to any of its deputies as to how to accommodate disabilities in the provision of law enforcement services. (PAPFOF 31.) Barron County has provided no training to any of its deputies in responding to incidents involving individuals that fall under the ADA. (PAPFOF 32.)

---

[9] If the person is convicted of a crime stemming from the arrest, the ability to make an "effects" theory claim evaporates. *Rosen v. Montgomery Cnty. Maryland*, 121 F.3d 154, 157–59 (4th Cir. 1997). However, there is no evidence Dylan was prosecuted for anything he did on or around July 14, 2021. (PAPFOF 85.)

Deliberate indifference requires a showing that (a) knowledge that a harm to a federally protected right is substantially likely, and (b) a failure to act upon that likelihood, to meet the legislative intent of combating disability discrimination that is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Lacy v. Cook Cnty., Illinois*, 897 F.3d at 863, *quoting Alexander v. Choate*, 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *see also Gray v. Cummings*, 917 F.3d 1, 17 (1st Cir. 2019) (the officer must know that the citizen has a "disability the required him to act differently than he would otherwise have acted, yet failed to adjust his behavior accordingly" or in other words, "her failure to follow his orders was a symptom of her mental illness rather than deliberate disobedience.") The knowledge requirement may be obviated when an officers actions are "so plainly antithetic to the ADA." *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019)

Here, the Defendants were specifically told that Dylan was suffering from mental illness and told of the likelihood that Dylan would attempt suicide by cop, and they did *nothing* to act upon that likelihood in order to protect Dylan from unnecessary harm.

A jury could find that it was the complete absence of *any* ADA training or compliance that explains, and caused, the deputies' handling of this entire scene. The deputies were inadequately trained to deal with disabled persons, and that fact was evidenced by their handling of this scene from start to finish. The fact that Defendants argue that there is "no reasonable accommodation was feasible during this crisis without increasing danger to Plaintiff and others," when Wisconsin has a Civil Commitment process is particularly disingenuous. (Dkt. 30, p. 35.)

## XI. A jury could find *Monell* liability.

"A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), *citing Monell*, 436 U.S. at 690, 98 S. Ct. 2019; *Valentino v. Vill. Of S. Chi. Heights*, 575 F.3d 664 (7th Cir. 2009). Plaintiff has alleged prong 1 and 3 violations.

### A. Defendant Sheriff Fitzgerald had personal involvement.

In this case, Sheriff Fitzgerald was involved throughout – he first took Dylan's Uncle's phone call on his personal phone. (PAPFOF 15.) He, as policymaker, then chose to open the call up as a "disorderly conduct CAD" rather than what it was – a call from a family member asking for help in dealing with another family member who was suffering from mental illness. (PAPFOF 16.) He informed deputies of a suicide-by-cop risk, but did not ask his deputies to respond any differently – such as by calling out the SWAT/ERT unit in the first instance. (DPFOF 4, 11.) Moreover, he was familiar with Dylan's prior history of mental-illness-related interactions with Barron County. (DPFOF 13, PAPFOF 1-14.) And, he, as Sheriff, exercised his control – assigning Sedani to be lead, and monitoring the response over dispatch. (DPFOF 12, 79.)

No doubt – as Defendants argue, Sheriff Fitzgerald did not do much (*see* DPFF 145, claiming Sheriff was simply directing traffic) – but that is in fact the problem,

because he as Sheriff, leader, and policymaker, was supposed to do more. For example, *Ravenna* v. *Vill. of Skokie*, 388 F. Supp. 3d 999, 1009 (N.D. Ill. 2019)[10] found the claim should go to trial if "a reasonable jury could find either that (1) [] decision-makers had the opportunity to advise the responding officers to take [the citizen's] mental illness into consideration in addressing the situation, or (2) that the Commander on the scene was an individual with such authority" or both. Just as in the case at bar, there was evidence of both the "effects" and the "accommodation" theories. Because there was evidence from which a jury could find that the County "understood [the citizen's] actions to be the product of mental illness, not criminal activity" a jury could find for plaintiff "on the 'effects' theory." *Id*. at 1009. And, the policy decision to arrest for a misdemeanor offense, "as applied to the misdemeanor disorderly conduct complaint against Ravenna, exhibits deliberate indifference to Ravenna's disability. *This case likely would have been avoided if Skokie had issued a summons rather than subjecting her to the alleged violence and indignity of arrest*. For this reason, a jury could find for Ravenna on the 'accommodation' theory." *Id*. at 1009.

The Sheriff here clearly had the "opportunity to advise the responding officers to take [the citizen's] mental illness into consideration in addressing the situation," and it is up to a jury whether he adequately did so.

---

[10] The Northern District of Illinois focused on policy-maker liability, finding that a public entity could not be held vicariously liable for the deliberate indifference of its employees. However, in the case at bar, and based on *King*, both parties here agree that the County is liable for the Defendants' deliberate indifference. (Dkt. 30, p. 33.)

Defendants agree that Barron County can be held responsible for the Sheriff's "policymaking" decision in directing the deputies' actions, citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). (Dkt. 30, p. 28.) They argue simply that there is not evidence that the Sheriff made "a deliberate choice to follow a course of action…from among various alternatives." *Id.* at 483-484. But he necessarily did, when he directed deputies to go to this scene for a *disorderly conduct* rather than to take suicide by cop precautions for a person in mental crisis. In *Pembaur*, deputies were serving an arrest order at the target's medical office, and walked into the reception area that was open to the public. *Id.* at 472. The remainder of the clinic was accessible only through an open door. *Id.* The receptionist blocked the deputies from traversing through the door and told them to wait for the doctor. *Id.* When the doctor appeared a moment later, he and the receptionist closed the door which automatically locked, and wedged a piece of wood between the door and the wall. *Id.* Through the receptionist's window, the deputies explained the papers they were there to serve, but the doctor refused, said police had no legal authority to be there, and asked them to leave, and said that he had called the Cincinnati police on the deputies. *Id.*

Cincinnati police responded, told the doctor the papers were lawful and he should allow the deputies to enter. *Id.* Ultimately, after multiple officers failed to persuade the doctor to open the door, the deputies called their supervisor, who told them to call the assistant prosecutor. *Id.* at 472-73. The assistant prosecutor consulted with the County Prosecutor, and they told deputies to just "go in and get" the witnesses – such that police obtained an axe and chopped down the door. *Id.* at 473. Without a

warrant or permission, that was unreasonable, even though officers were seeking to arrest third parties inside, and because high-level County policymakers were involved in making that decision, the County faced *Monell liability.*

Here, the Sheriff did make decisions on this complaint he received from a fellow local Politian, and Dylan's uncle – from opening this up as a disorderly conduct arrest rather than a Chapter 51 case (PAPFOF 16), from not advising his deputies that they needed to get a warrant before they went to Dylan's house to arrest him for this misdemeanor (PAPFOF 29), but mostly from not telling them they *had* to adjust their response to accommodate Dylan's mental illness, which violated both Title II and the *reasonableness* requirement of the Fourth Amendment. The Sheriff, knowing all he knew, sent Deputy Weigand and other officers to the scene knowing that the deputies' warrantless, uninvited presence, for a nonurgent at-home misdemeanor arrest, would be simply *escalating* the danger. (DPFOF 79, *citing* Fitzgerald Decl. ¶ 8). At the same time, Sheriff Fitzgerald activated the Barron County Emergency Response Team ("ERT"). (DPFOF 81, *citing* Fitzgerald Decl. ¶ 10), but he does not explain why he did not order all of his deputies wait for the SWAT/ERT to arrive before breaching the safe-distance perimeter. Sheriff Fitzgerald had a good deal more personal involvement than what was held adequate for *Monell* liability in *Pembaur,* where officers only called the policymaker breifly in the middle of an incident. *Id.* at 473.

**B. The obvious consequence of an arrest policy that in no way restricts officers from conducting routine at-home warrantless arrests is that officers will unconstitutionally arrest people at home on probable cause alone, in violation of the Fourth Amendment.**

The jury could find that the officers, in conducting a warrantless at-home arrest, were not rogue officers, nor officers misapplying their training, but rather were simply abiding by their official arrest policy. Barron County's arrest policy did not provide its deputies with any restrictions on warrantless at-home arrests or trespassing, and allowed arrests on probable cause alone without restrictions. (PAPFOF 34-35.) All of the deputies *and the Sheriff* responded to this scene, in their efforts to effectuate a warrantless at-home arrest, and *not one* attempted to apply for a warrant. (PAPFOF 33.)

Defendants' primary argument is that there is no "pattern" of violations which would make it obvious that Defendants' arrest policy, which does not restrict warrantless at home arrests, would lead to violations. No pattern is needed. It is only where "the policy relied upon is not itself unconstitutional [that] considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Robles v. City of Fort Wayne*, 113 F.3d 732, 737 (7th Cir. 1997). The deliberate indifference test is "a judicial gloss" and therefore somewhat of a fluid, case by case concept, but it is an objective test, "permitting liability to be premised on obviousness or constructive notice." *Farmer v. Brennan*, 511 U.S. 825, 840-41, 114 S.Ct. 1970 (1994). Put simply, liability attaches "when a municipality disregards 'obvious' needs." *Id.* at 841. The municipality is directly liable when its

"existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like hers" *or* where the risk of cognizable harm is so great and obvious as to override the need to demonstrate a pattern. *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019).

This can happen when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391; *see also Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 928-29 (7th Cir. 2004), *citing Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 409, 117 S.Ct. 1382 (In addressing an attempted *Monell* defense that the lack of evidence of any prior suicide doomed proof of a custom or practice, the court held, "CMS does not get a 'one free suicide' pass. The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act.")

The example the Supreme Court gave in *Canton* is directly appliable here:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus,

> the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton, Ohio v. Harris*, 489 U.S. at 390, n. 10. Similarly, it is a moral certainty that deputies will routinely (if not mainly) conduct arrests and investigation, and are given handcuffs and guns to effectuate that task. Thus, the failure to train officers in the constitutional limitations of arresting or investigating someone inside their home or curtilage *without a warrant* is simply bound to result in the violation of rights.

At trial, the individual Defendants could argue against punitive damages, stating that they did not *know* they needed a warrant for an at-home arrest, because their department's policy did not require it. The official policy which carried with it the obvious risk that officers would violate the rights of suspected misdemeanants at home, came to fruition here. Though the officers acted unconstitutionally, they were also acting consistently with Barron County's arrest policy. *See Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) ("A municipality would thus evince a deliberate indifference to the constitutional rights of its citizens by failing to train its employees 'with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face…It would also be deliberately indifferent if it failed to provide further training after learning of a pattern of constitutional violations involving the exercise of police discretion…Under either scenario, the finding of 'deliberate indifference' is derived from the City's failure to act in the face of 'actual or

constructive notice' that such a failure is likely to result in constitutional deprivations.").

**Conclusion**

Defendant's motion for summary judgment should be denied in its entirety.

Dated this Thursday, August 14, 2025.

Respectfully submitted,

Dylan Hancock,

Plaintiff,

BY

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
ANDREA J. FARRELL
State Bar Number 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone 608/283-6001
Fax 608/283-0945
Email: jsolson@scofflaw.com

/s/Jeff Scott Olson
Jeff Scott Olson
ATTORNEY FOR PLAINTIFFS